GLASTONBURY EDUCATION ASSOCIATION *v.* FREEDOM
OF INFORMATION COMMISSION ET AL.

MARILYN CAMPBELL, COMMISSIONER OF EDUCATION,
ET AL. *v.* FREEDOM OF INFORMATION
COMMISSION ET AL.
(15049)

PETERS, C. J., and CALLAHAN, BORDEN, BERDON and PALMER, Js.

Argued May 30—decision released August 8, 1995

*Colleen M. Murphy*, associate general counsel, with whom, on the brief, was *Mitchell W. Pearlman*, general counsel, for the appellant (named defendant).

*William J. Dolan*, for the appellee (plaintiff Glastonbury Education Association).

*Ralph E. Urban*, assistant attorney general, with whom, on the brief, were *Richard Blumenthal*, attorney general, and *Bernard F. McGovern, Jr.*, assistant attorney general, for the appellee (plaintiff commissioner of education).

PETERS, C. J. The sole issue in this certified appeal is whether the Appellate Court properly concluded that, in the circumstances of this case, compulsory arbitration proceedings under the Teacher Negotiation Act (TNA); General Statutes § 10-153a et seq.; are exempt from the public meeting requirement of the Freedom of Information Act (FOIA); General Statutes §§ 1-18a and 1-21;[1] because they constitute "strategy or nego-

---

[1] General Statutes § 1-18a provides in relevant part: "DEFINITIONS. As used in this chapter, the following words and phrases shall have the following meanings, except where such terms are used in a context which clearly indicates the contrary:

"(a) 'Public agency' or 'agency' means any executive, administrative or legislative office of the state or any political subdivision of the state and any state or town agency, any department, institution, bureau, board, com-

tiations with respect to collective bargaining." The complainants, Kathleen Stack and James Hallas, the editor and the publisher of the Glastonbury Citizen newspaper, filed a complaint with the freedom of information commission (FOIC) after Stack had been denied admission to an arbitration proceeding between the plaintiff Glastonbury Education Association (GEA) and the Glastonbury Board of Education (board). The FOIC determined that Stack improperly had been denied access to the arbitration hearing. The plaintiffs, the GEA, the commissioner of education and the arbitrators, appealed from the FOIC decision to the Superior Court pursuant to General Statutes §§ 1-21i (b) and 4-183 (a).[2] The Superior Court sustained the appeal,

mission, authority or official of the state or of any city, town, borough, municipal corporation, school district, regional district or other district or other political subdivision of the state, including any committee of, or created by, any such office, subdivision, agency, department, institution, bureau, board, commission, authority or official, and also includes any judicial office, official or body or committee thereof but only in respect to its or their administrative functions.

"(b) 'Meeting' means any hearing or other proceeding of a public agency, any convening or assembly of a quorum of a multimember public agency, and any communication by or to a quorum of a multimember public agency, whether in person or by means of electronic equipment, to discuss or act upon a matter over which the public agency has supervision, control, jurisdiction or advisory power. 'Meeting' shall not include . . . strategy or negotiations with respect to collective bargaining . . . ."

General Statutes § 1-21 provides in relevant part: "MEETINGS OF GOVERNMENT AGENCIES TO BE PUBLIC. . . . (a) The meetings of all public agencies . . . shall be open to the public. . . ." The parties do not dispute that the state arbitration panel is a public agency so we do not reach this issue.

[2] General Statutes § 1-21i provides in relevant part: "DENIAL OF ACCESS TO PUBLIC RECORDS OR MEETINGS. APPEALS. . . .

"(b) (1) Any person denied the right to inspect or copy records under section 1-19 or wrongfully denied the right to attend any meeting of a public agency or denied any other right conferred by sections 1-15, 1-18a, 1-19 to 1-19b, inclusive, 1-20a and 1-21 to 1-21k, inclusive, may appeal therefrom to the Freedom of Information Commission, by filing a notice of appeal with said commission. . . ."

General Statutes § 4-183 provides in relevant part: "APPEAL TO SUPERIOR COURT. (a) A person who has exhausted all administrative remedies

and the Appellate Court affirmed. *Glastonbury Education Assn.* v. *Freedom of Information Commission*, 35 Conn. App. 111, 643 A.2d 1320 (1994). We granted certification to appeal from the judgment of the Appellate Court, limited to the issue: "Do binding interest arbitration proceedings conducted pursuant to General Statutes §§ 10-153a through 10-153n fall within the exemption from public disclosure [for strategy or negotiations with respect to collective bargaining] contained in General Statutes § 1-18a (b)?" *Glastonbury Education Assn.* v. *Freedom of Information Commission*, 231 Conn. 922, 648 A.2d 162 (1994). Because we conclude that at least part of such a hearing may be closed to the public under the "strategy or negotiations" provision of § 1-18a (b), we affirm the judgment of the Appellate Court.[3]

The record reveals the following facts. After the GEA and the board had failed to reach agreement on a new union contract, compulsory binding arbitration was imposed by the commissioner of the department of education pursuant to General Statutes § 10-153f.[4] On

---

available within the agency and who is aggrieved by a final decision may appeal to the superior court as provided in this section. . . ."

[3] Even though the proceedings at issue here long since have concluded, and hence there is nothing to which a remand could be directed, the appeal is not moot because of the continuing order to the plaintiffs to conduct future negotiations in accordance with the FOIC order under challenge in this appeal. As a result, the justiciable question before us relates to the plaintiffs' *future* negotiations under the TNA, not to whether Stack was wrongly denied admission to any part of the arbitration hearing held on December 9, 1990. The concern expressed in part III of the concurring opinion apparently is grounded in a misunderstanding of this procedural posture.

[4] General Statutes § 10-153f provides in relevant part: "MEDIATION AND ARBITRATION OF DISAGREEMENTS. . . .

"(b) . . . . On the one hundred sixtieth day prior to the budget submission date, the commissioner shall order the parties to report their settlement. If, on such one hundred sixtieth day, the parties have not reached agreement and have failed to initiate mediation, the commissioner shall order the parties to notify the commissioner of the name of a mutually selected mediator and to commence mediation. . . .

December 8, 1990, an arbitration hearing was held to allow each side to present its "last best offer" and evi-

"(c) (1) On the fourth day next following the end of the mediation session or on the one hundred thirty-fifth day prior to the budget submission date, whichever is sooner, the commissioner shall order the parties to report their settlement of the dispute or, if there is no settlement, to notify the commissioner of either their agreement to submit their dispute to a single arbitrator or the name of the arbitrator selected by each of them. . . . If each party has notified the commissioner of the name of the arbitrator it has selected, within five days after such notification, the commissioner shall select a third arbitrator, who shall be an impartial representative of the interests of the public in general. . . . Whenever a panel of three arbitrators is selected, the chairperson of such panel shall be the impartial representative of the interests of the public in general.

"(2) The chairperson of the arbitration panel or the single arbitrator shall set the date, time and place for a hearing to be held in the school district between the fifth and twelfth day, inclusive, after such chairperson or such single arbitrator is selected. At least five days prior to such hearing, a written notice of the date, time and place of the hearing shall be sent to the board of education and the representative organization which are parties to the dispute, and, if a three-member arbitration panel is selected or designated, to the other members of such panel. Such written notice shall also be sent to the fiscal authority having budgetary responsibility or charged with making appropriations for the school district, and a representative designated by such body may be heard at the hearing as part of the presentation and participation of the board of education. At the hearing each party shall have full opportunity to submit all relevant evidence, to introduce relevant documents and written material, and to argue on behalf of its positions. At the hearing a representative of the fiscal authority having budgetary responsibility or charged with making appropriations for the school district shall be heard regarding the financial capability of the school district, unless such opportunity to be heard is waived by the fiscal authority. The nonappearance of the representative shall constitute a waiver of the opportunity to be heard unless there is a showing that proper notice was not given to the fiscal authority. The chairperson of the arbitration panel or the single arbitrator shall preside over such hearing.

"(3) The hearing may, at the discretion of the arbitration panel or the single arbitrator, be continued but in any event shall be concluded within twenty-five days after its commencement.

"(4) After hearing all the issues, the arbitrators or the single arbitrator shall, within twenty days, render a decision in writing, signed by a majority of the arbitrators or the single arbitrator, which states in detail the nature of the decision and the disposition of the issues by the arbitrators or the single arbitrator. The written decision shall include a narrative explaining the evaluation by the arbitrators or the single arbitrator of the evidence

dence and argument in favor of its position. See General Statutes § 10-153f (c) (2). Stack sought to attend this hearing, but was denied admission by the arbitration panel.

---

presented for each item upon which a decision was rendered by the arbitrators or the single arbitrator and shall state with particularity the basis for the decision as to each disputed issue and the manner in which the factors enumerated in this subdivision were considered in arriving at such decision, including, where applicable, the specific similar groups and conditions of employment presented for comparison and accepted by the arbitrators or the single arbitrator and the reason for such acceptance. The arbitrators or the single arbitrator shall file one copy of the decision with the commissioner, each town clerk in the school district involved and the board of education and organization which are parties to the dispute. The decision of the arbitrators or the single arbitrator shall be final and binding upon the parties to the dispute unless a rejection is filed in accordance with subdivision (7) of this subsection. The decision of the arbitrators or the single arbitrator shall incorporate those items of agreement the parties have reached prior to its issuance. At any time prior to the issuance of a decision by the arbitrators or the single arbitrator, the parties may jointly file with the arbitrators or the single arbitrator, any stipulations setting forth contract provisions which both parties agree to accept. In arriving at a decision the arbitrators or the single arbitrator shall give priority to the public interest and the financial capability of the town or towns in the school district, including consideration of other demands on the financial capability of the town or towns in the school district. The arbitrators or the single arbitrator shall further consider, in light of such financial capability, the following factors: (A) The negotiations between the parties prior to arbitration, including the offers and the range of discussion of the issues; (B) the interests and welfare of the employee group; (C) changes in the cost of living averaged over the preceding three years; (D) the existing conditions of employment of the employee group and those of similar groups; and (E) the salaries, fringe benefits, and other conditions of employment prevailing in the state labor market, including the terms of recent contract settlements or awards in collective bargaining for other municipal employee organizations and developments in private sector wages and benefits. The parties shall submit to the arbitrators or the single arbitrator their respective positions on each individual issue in dispute between them in the form of a last best offer. The arbitrators or the single arbitrator shall resolve separately each individual disputed issue by accepting the last best offer thereon of either of the parties, and shall incorporate in a decision each such accepted individual last best offer and an explanation of how the total cost of all offers accepted was considered. The award of the arbitrators or the single arbitrator shall not be subject to rejection by referendum. The parties shall each pay the fee of the arbitrator selected by or for them and

Stack and Hallas filed a complaint with the FOIC against the board and the arbitration panel.[5] After a contested hearing, the FOIC found that although the "purpose of the [arbitration] hearing was to allow the [board] and the [GEA] to each present a 'last best contract' offer and to submit evidence and argument on behalf of their positions," "the parties . . . can negotiate an agreement on their own with respect to *any* of the disputed issues, prior to the determination of the respondent panel . . . ." The FOIC concluded that "although [such] hearings may and often do lead to further negotiation, the actual arbitration hearing in this case . . . constituted a meeting within the meaning of § 1-18a (b), which should have been open to the public pursuant to § 1-21 . . . ." The FOIC determined that the hearing must be open unless the GEA, the board and the arbitrators "prove[d] . . . that collective bargaining negotiations actually occurred during the hearing in question." It found that the parties had failed to meet this burden.

The GEA, the commissioner of education and the arbitration panel appealed to the trial court, which sustained their appeal. That court held that, because compulsory arbitration proceedings are a continuation of strategy and negotiations with respect to collective bargaining, they do not constitute "meetings" pursuant to § 1-18a (b) and thus they need not be open to the pub-

---

share equally the fee of the third arbitrator or the single arbitrator and all other costs incidental to the arbitration.

* * *

"(d) The commissioner and the arbitrators or single arbitrator shall have the same powers and duties as the board under section 31-108 for the purposes of mediation or arbitration pursuant to this section, and subsection (c) of section 10-153d, and all provisions in section 31-108 with respect to procedure, jurisdiction of the superior court, witnesses and penalties shall apply. . . ."

[5] The GEA later asked to be made a party to the proceedings before the FOIC; the FOIC granted that request.

lic. On appeal from the trial court, the Appellate Court affirmed the judgment and the reasoning of the trial court. *Glastonbury Education Assn.* v. *Freedom of Information Commission*, supra, 35 Conn. App. 118–19. Viewing compulsory arbitration under the TNA as a part of the collective bargaining process, the Appellate Court held that such arbitration is excluded from the definition of "meeting" contained in the FOIA. Id.

The FOIC challenges the Appellate Court's conclusion that the relationship between compulsory binding arbitration hearings and collective bargaining automatically excludes such hearings in their entirety from the ambit of "meetings" of government agencies that are presumptively open to the public under § 1-21 (a). The statutory exclusion from the open meeting requirement contained in § 1-18a (b) provides that " '[m]eeting' shall not include . . . strategy or negotiations with respect to collective bargaining . . . ." In the view of the FOIC, the legislature intended this exclusion to encompass only those aspects of any collective bargaining process, including compulsory binding arbitrations, that directly involve strategy or negotiations. Although we agree with the FOIC in part, on the present record we affirm the judgment of the Appellate Court.

This appeal raises two interrelated issues of statutory construction. What is the scope of the exclusion for collective bargaining contained in § 1-18a (b)?[6] To what extent are compulsory arbitration proceedings under the TNA properly characterized as collective bargaining and as strategy or negotiations relating thereto?

Inquiry into the scope of the statutory exclusion for collective bargaining contained in § 1-18a (b) must com-

---

[6] The parties do not dispute that the arbitration panel convened under the TNA is a public agency for purposes of the meeting requirement of § 1-18a (b).

mence with the recognition of the legislature's general commitment to open governmental proceedings. "The overarching legislative policy of the FOIA is one that favors 'the open conduct of government and free public access to government records.' " *Perkins* v. *Freedom of Information Commission*, 228 Conn. 158, 166, 635 A.2d 783 (1993), citing *Wilson* v. *Freedom of Information Commission*, 181 Conn. 324, 328, 435 A.2d 353 (1980); see also *Board of Education* v. *Freedom of Information Commission*, 208 Conn. 442, 450, 545 A.2d 1064 (1988) ("general policy of openness expressed in the FOIA legislation"). The sponsors of the FOIA understood the legislation to express the people's sovereignty over "the agencies which serve them"; see *Wilson* v. *Freedom of Information Commission*, supra, 328, citing 18 H.R. Proc., Pt. 8, 1975 Sess., p. 3911, remarks of Representative Martin Burke; and this court consistently has interpreted that expression to require diligent protection of the public's right of access to agency proceedings. "Our construction of the [FOIA] must be guided by the policy favoring disclosure and exceptions to disclosure must be narrowly construed." *Gifford* v. *Freedom of Information Commission*, 227 Conn. 641, 651, 631 A.2d 252 (1993); *Superintendent of Police* v. *Freedom of Information Commission*, 222 Conn. 621, 626, 609 A.2d 998 (1992); see also *Kureczka* v. *Freedom of Information Commission*, 228 Conn. 271, 277, 636 A.2d 777 (1994); *Ottochian* v. *Freedom of Information Commission*, 221 Conn. 393, 398, 604 A.2d 351 (1992); *Rose* v. *Freedom of Information Commission*, 221 Conn. 217, 232, 602 A.2d 1019 (1992); *Hartford* v. *Freedom of Information Commission*, 201 Conn. 421, 431, 518 A.2d 49 (1986); *Maher* v. *Freedom of Information Commission*, 192 Conn. 310, 315, 472 A.2d 321 (1984); *Wilson* v. *Freedom of Information Commission*, supra, 328–29.

In light of these principles, the statutory definition of public meetings contained in § 1-18a (b) must be read

to limit rather than to expand the opportunities for public agencies to hold closed hearings. Accordingly, the language providing that public meetings "shall not include . . . strategy or negotiations with respect to collective bargaining" means, as the FOIC maintains, that what is excluded from the term "meeting" is not *all* collective bargaining, but only "strategy or negotiations" sessions that relate to collective bargaining. This interpretation accords proper respect for the manifest legislative policy expressed in the FOIA. It also comports with its legislative history, which suggests that the collective bargaining exception was understood to provide privacy for "the *give-and-take in negotiating sessions* of collective bargaining . . . ." (Emphasis added.) 18 H.R. Proc., supra, p. 3896. Had the legislature intended a broader exclusion, it could have excluded "collective bargaining" without limitation, or it could have excluded "collective bargaining, including but not limited to strategy and negotiations relating thereto." See *Bloomfield Education Assn.* v. *Frahm*, 35 Conn. App. 384, 389, 646 A.2d 247, cert. denied, 231 Conn. 926, 648 A.2d 161 (1994). It chose neither of these options.

Our interpretation of § 1-18a (b) finds further support in related provisions of the FOIA that provide limited exceptions to the public disclosure requirement for those portions of proceedings that relate to strategy or negotiations. In § 1-18a (e) (2), for example, the legislature authorized a public agency to adjourn a meeting into executive session for "strategy and negotiations with respect to pending claims and litigation" to which the agency itself is a party. Pointedly, the legislature did not adopt a more sweeping approach, such as closing the entire meeting, to achieve its purpose of sheltering specified components of the proceedings from public scrutiny. See *Board of Police Commissioners* v. *Freedom of Information Commission*, 192 Conn. 183, 190, 470 A.2d 1209 (1984) (agency's

authority under § 1-18a [e] [1] to adjourn into executive session for deliberations during proceedings about public employee's job performance does not include authority to conduct evidentiary portion of proceedings in private). Similarly, the legislature has exempted from public disclosure not all documents relating to collective bargaining, but only "records, reports and statements of strategy or negotiations with respect to collective bargaining." General Statutes § 1-19 (b) (9). Although the legislature's narrowly tailored approach to the FOIA exclusions and exemptions may add a layer of complexity to agency administration, the legislature implicitly has decided that the associated costs are outweighed by the benefits derived from open government.

With these principles in mind, we turn to the structure of the TNA. Although TNA arbitrations arise out of an initial failure to reach agreement in ordinary collective bargaining, they were designed to provide incentives for further bargaining between the parties. The TNA establishes a sequence of increasingly formal collective bargaining procedures to ensure the existence of a teacher contract by the beginning of the town's fiscal year. A board of education and representatives of the teachers' union have a statutory duty to negotiate concerning salary and other conditions of employment. General Statutes § 10-153d (b). Those negotiations must commence no later than 210 days prior to the budget submission date for the board. General Statutes § 10-153d (b). If a complete negotiated settlement has not been reached by 160 days prior to the submission date, the statutes mandate that the parties proceed to mediation. General Statutes § 10-153f (b). Finally, if mediation has not settled all remaining disputes by 135 days prior to the submission date, the statute imposes mandatory last best offer arbitration.[7]

---

[7] Arbitration under § 10-153f also commences upon the legislative veto of a negotiated contract; see General Statutes § 10-153d (c); or on the fourth day following the end of mediation. General Statutes § 10-153f (c) (1).

General Statutes § 10-153f (c) (1). After a hearing at which each party may present all relevant evidence, the arbitral panel "shall resolve separately each individual disputed issue by accepting the last best offer thereon of either of the parties . . . ." General Statutes § 10-153f (c) (4). The arbitral panel also is required to include in its decision any agreements previously arrived at by the parties. General Statutes § 10-153f (c) (4).

The issue raised by this three-step collective bargaining process is how to fit the process into the open meetings provisions of the FOIA. The various steps contemplated by the TNA could be construed as establishing a structural division between "negotiation," which occurs at step one, and "arbitration," which occurs at step three and occurs only if both negotiation and mediation have failed to result in a contract. Such a construction of the TNA would not comport, however, with the underlying realities of the TNA process.

The TNA contemplates arbitration proceedings that interface with collective bargaining between the parties and collective bargaining's attendant "strategy and negotiations." The TNA permits the arbitration proceedings to be continued, at the discretion of the arbitrators, provided that the arbitration hearing concludes within twenty-five days after its commencement. General Statutes § 10-153f (c) (3). The apparent purpose of this provision is to afford the parties an opportunity to pursue further negotiations on their own even after compulsory arbitration has commenced, if the arbitration panel believes that such negotiations could prove fruitful. Even when not formally recessed for "negotiations," the arbitration hearing itself contains elements of strategy and negotiations.

Uncontradicted evidence in the record before the FOIC documents that a TNA arbitration does not oper-

ate as a typical quasi-judicial process, but rather as a stylized or ritualized mediated negotiation process in which the parties submit initial last best offers, interim last best offers and final last best offers. Throughout the process, the threat of the arbitration panel's decision-making power provides a strong incentive for the parties to resolve outstanding issues.[8] Testimony before the FOIC in this case indicated that the arbitrators "don't receive the parties' absolute final position until the very end of the hearing and the parties often and usually present a different position when they open the hearing . . . ."

This description comports with the general understanding of how compulsory binding interest arbitration hearings are usually conducted. One outside commentator has observed that the theory undergirding last best offer arbitration is that "the logic of the procedure would force negotiating parties to continue moving closer together in search of a position that would be most likely to receive neutral sympathy. . . . Flexible procedures of this kind, clearly designed to encourage voluntary settlements prior to, during and even after the completion of the hearing, are obviously a hybrid of mediation and arbitration. . . . Flexible final-offer procedures . . . almost inevitably result in a proceeding which is known as mediation-arbitration, often called simply 'med-arb'. . . . Ordinary interest arbitration is normally a somewhat judicial procedure in which the neutral [arbitrator] takes evidence and then drafts the parties' 'agreement' in the loneliness of his own study. In med-arb [however] the neutral

---

[8] In interpreting a nearly identical statute, General Statutes § 7-473c, this court noted that the "primary emphasis of the legislation was to induce settlement of disputes *by negotiation* under the impetus that the most reasonable proposal would probably gain acceptance by the arbitrators." (Emphasis added.) *Carofano* v. *Bridgeport*, 196 Conn. 623, 635, 495 A.2d 1011 (1985).

[arbitrator] customarily works out solutions in the presence of and with input from the parties." C. Rehmus, "Interest Arbitration," in Portrait of a Process: Collective Negotiations in Public Employment (1979) pp. 218–20. As we held recently in interpreting similar provisions of the Municipal Employees Relations Act, by requiring the arbitrators to accept revised last best offers, binding arbitration procedures facilitate further collective bargaining between the parties. *International Brotherhood of Police Officers, Local 564* v. *Jewett City*, 234 Conn. 123, 133–34, 661 A.2d 573 (1995).

These operational characteristics of compulsory arbitration under the TNA persuade us that the actual presentation of last best offers by the parties sufficiently resembles "negotiations," despite the fact that they occur during a proceeding denominated as "arbitration," to be excluded from the "meeting" requirements of the FOIA. Because the FOIC order in this case determined that Stack should have been permitted to attend the entire arbitration hearing, and ordered that similar hearings in the future likewise be open to the public in their entirety, the FOIC's unconditional order was improper as a matter of law.

We note that the TNA permits each party, in its presentations to the arbitral board, "to submit all relevant evidence, to introduce relevant documents and written material, and to argue on behalf of its" last best offer. General Statutes § 10-153f (c) (2). In aid of this evidentiary process, the arbitrators have the "power to administer oaths and affirmations and to issue subpoenas requiring the attendance of witnesses." General Statutes § 31-108; see General Statutes § 10-153f (d). Thus, the arbitration hearing also provides an opportunity for the parties to create an evidentiary record on which the arbitrators can rely in making their final

determination of any issues left unresolved.[9] Since we already have concluded that the FOIC order at issue here cannot stand, we postpone to another day questions concerning the validity of a more narrowly tailored FOIC order that requires open hearings only with respect to evidentiary presentations and permits executive sessions for discussion and argument about the contents of the parties' last best offers.

The judgment of the Appellate Court is affirmed.

In this opinion CALLAHAN and PALMER, Js., concurred.

BORDEN, J., concurring in part, and dissenting in part. I agree with the majority that the judgment of the Appellate Court should be affirmed because the freedom of information commission (FOIC) order in this case improperly required the "last best offer" arbitration hearings to be open to the public in their entirety. I disagree, however, with the majority's reservation of the issue of "the validity of a more narrowly tailored FOIC order that requires open hearings only with respect to evidentiary presentations and permits executive sessions for discussion and argument about the contents of the parties' last best offers." In my view, "last best offer" arbitration proceedings under the Teacher Negotiation Act do not fall with the definition of "meeting" as that term is used in General Statutes § 1-18a (b), and the public may be excluded from such proceedings in their entirety.

---

[9] The statute specifically contemplates the presentation of certain financial data. General Statutes § 10-153f (c) (2) provides in relevant part: "At the hearing a representative of the fiscal authority having budgetary responsibility or charged with making appropriations for the school district shall be heard regarding the financial capability of the school district, unless such opportunity to be heard is waived by the fiscal authority. The nonappearance of the representative shall constitute a waiver of the opportunity to be heard unless there is a showing that proper notice was not given to the fiscal authority."

I

First, I think that the certified question, which asks whether binding interest arbitration proceedings "fall *within the exemption* from public disclosure contained in General Statutes § 1-18a (b)" (emphasis added) is analytically incorrect, and that the majority builds on that analytical error when it refers to the "statutory exclusion from the open meeting requirement contained in § 1-18a (b)." Section 1-18a is the definitional section of the Freedom of Information Act (FOIA). Thus, it is the section that determines whether something is a meeting in the first instance, not whether something is excluded from "the open meeting requirement." The question in this case is whether the arbitration proceedings come within the definition of "meeting" in § 1-18a (b) and are, therefore, covered by the FOIA in the first instance, not whether they are otherwise covered proceedings that are exempted from the open meeting requirement.

I agree that, in construing the definitions contained in § 1-18a, we do so in light of the general principle of openness embodied by the FOIA. See *Board of Trustees* v. *Freedom of Information Commission*, 181 Conn. 544, 551, 436 A.2d 266 (1980). I disagree, however, that that principle applies with the same force under § 1-18a as it does under General Statutes § 1-19 (b). See *Rules Committee of the Superior Court* v. *Freedom of Information Commission*, 192 Conn. 234, 472 A.2d 9 (1984); *Connecticut Bar Examining Committee* v. *Freedom of Information Commission*, 209 Conn. 204, 550 A.2d 633 (1988); *Board of Education* v. *Freedom of Information Commission*, 213 Conn. 216, 566 A.2d 1362 (1989), affirming *Board of Education* v. *Freedom of Information Commission*, 41 Conn. Sup. 267, 566 A.2d 1380 (1988); *Connecticut Humane Society* v. *Freedom of Information Commission*, 218 Conn. 757, 591 A.2d 395

(1991); *Elections Review Committee of the Eighth Utilities District* v. *Freedom of Information Commission*, 219 Conn. 685, 595 A.2d 313 (1991). Thus, I agree that, in deciding whether the arbitration proceedings in this case come within the definition of "meeting" contained in § 1-18a (b), we must do so in light of the general purpose of openness embodied in the FOIA. As I explain below, however, that general purpose is insufficient to overcome the other, more specific evidence that the legislature, in enacting the definition that applies to this case, did not intend the arbitration proceedings at issue here to be within that definition.

## II

The language at issue in this case is as follows: " 'Meeting' means any hearing or other proceeding of a public agency . . . to discuss or act upon a matter over which the public agency has . . . control [or] jurisdiction . . . . 'Meeting' shall not include . . . strategy or negotiations with respect to collective bargaining . . . ." General Statutes § 1-18a (b). This language, taken alone, gives very little guidance on how to decide this case. Both parts of the definition—what "meeting" "*means*" and what it "*shall not include*"— are put in very broad terms. In this connection, I do not think that the use of the phrase "strategy or negotiations" was meant to be a limitation on the meaning of "collective bargaining," but, as I explain below, was meant to be an expansive phrase—in effect, to signify that the legislature meant to cover all of the aspects— both intraparty (strategy) and interparty (negotiations)—of the collective bargaining process, and everything in between.

Although the specific statutory language, as applied to the facts of this case, sheds little light on how to decide this case, the legislative history is very illuminating. The legislator who presented the amendment to

the House of Representatives stated: "The first thing the Amendment does is to take the concept of collective bargaining out of the 'right to know law.' In other words, [in] the definitional section of meeting of a public agency, collective bargaining is not included. The Committee felt, after discussions with many parties, that the area of collective bargaining was distinctly different from any other governmental process or a process that governments engage in. It was thought that the give-and-take in negotiating sessions of collective bargaining was much too sensitive to require that this be done in public. It also could possibly result in violations of various labor Acts as an unfair labor practice. That is, if a public agency demanded that the negotiations take place in public and the bargainers for the employees did not want this. We further felt that the area of abuses that we're trying to get at by this sweeping Freedom of Information Act were not really in the area of labor negotiations. So for those reasons, *we took out collective bargaining from a definition of a meeting of a public agency and so this Act doesn't deal at all with collective bargaining.*" (Emphasis added.) 18 H.R. Proc., Pt. 8, 1975 Sess., p. 3896, remarks of Representative Martin B. Burke. This clearly indicates a legislative intent to exclude the process of collective bargaining from the coverage of the FOIA.

This reading of the legislative history is also consistent with the dictionary definitions of "strategy" and "negotiations" that are the most appropriate to the subject of collective bargaining. Those definitions are, in my view, as follows.

Strategy is defined as "the art of *devising or employing plans or stratagems.*" (Emphasis added.) Webster's Third New International Dictionary. This suggests that strategy goes beyond devising to include the implementation of the plan or stratagem devised. Thus, it would

include not only the plans devised by the parties in the course of the arbitration process, but their putting those plans into practice during that process.

Negotiation is defined as "the action or process of negotiating," and negotiate is variously defined as: "to communicate or confer with another so as to arrive at the settlement of some matter: meet with another so as to arrive through discussion at some kind of agreement or compromise about something"; "to arrange for or bring about through conference and discussion: work out or arrive at or settle upon by meetings or agreements or compromises"; and "to influence successfully in a desired way by discussions and agreements or compromises." Webster's Third New International Dictionary. These definitions go beyond the mere "quid pro quo" part of the negotiation process, and would include the entire presentation during the arbitration process.[1]

In addition, the fact that the statute does not explicitly mention "mediation" supports this broad reading. It would be difficult to conclude that the process of mediation, which is essentially a process of negotiation between the principals aided by a mediator, was not meant to be excluded by the legislature in its statutory formulation of what a "meeting" does not include. This suggests, therefore, that, consistent with the legislative history, the legislature meant the phrase "strategy or negotiations with respect to collective bargaining" to be a unitary phrase, and to be broadly con-

---

[1] The majority points to § 1-19 (b) (9), asserting that "the legislature has exempted from public disclosure not all documents relating to collective bargaining, but only 'records, reports and statements of strategy or negotiations with respect to collective bargaining.' " In my view, this conclusory statement begs the question. Based on my analysis of the legislative history, "records, reports and statements of strategy or negotiations with respect to collective bargaining" is also meant to cover the waterfront on collective bargaining, not narrow the field.

strued to cover the entire continuum of the collective bargaining process.

The majority asserts that "[h]ad the legislature intended a broader exclusion, it could have excluded 'collective bargaining' without limitation, or it could have excluded 'collective bargaining, including but not limited to strategy and negotiations relating thereto.'" Although I agree that this language would also carry the meaning I ascribe to the language that the legislature *did* enact, the fact that the legislature could have phrased its intention differently is essentially irrelevant. Our task in statutory interpretation is to determine what the legislature meant by the language it did use. With judicial hindsight it is always possible to construct clearer language that would have better conveyed the legislature's intent, particularly with respect to a factual situation that the legislature might not have specifically contemplated. In short, I "see no justification to thwart the legislature's purpose simply because that purpose could have been stated more clearly." *Frillici* v. *Westport*, 231 Conn. 418, 436, 650 A.2d 557 (1994).

My conclusion that the last best offer arbitration proceeding does not constitute a meeting within the meaning of the FOIA is also consistent with the record in this case. The majority aptly describes the process of last best offer arbitration as a combination of mediation and arbitration that " 'force[s] negotiating parties to continue moving closer together in search of a position that would be most likely to receive neutral sympathy.'" That this " '[f]lexible [procedure is] clearly designed to encourage voluntary settlements prior to, during and even after the completion of the hearing'" supports my broad reading of the statutory language. The witnesses who testified before the FOIC hearing officer described the collective bargaining process as a continuum, consisting of negotiation, mediation and

arbitration. The record is also clear that the last best offer process is itself a kind of strategizing and negotiation between the parties, by which the parties themselves continually modify their various "last best offers" in response to the other party's various "last best offers." In addition, when the parties themselves agree—either on all or part of the issues—they are required to present those agreements to the arbitrators, who *must* then accept them and render their award accordingly as a "stipulated award." The record also discloses that even the evidence that the parties present in the arbitration proceeding is presented in connection with their "last best offers." Thus, it cannot be separated out from the process of conveying those offers. In effect, there are two audiences for that evidence: (1) the arbitrators; and (2) the other side.

The majority's reservation of the issue of whether the "evidentiary presentations" may be subject to an FOIC open meeting order is unworkable in the context of this kind of arbitration. First, it assumes that part of the arbitration proceedings can fit within the statutory definition of "meeting" while the remainder falls without. It is unrealistic to slice up the proceeding that way, and I see no basis for it in the language or purpose of the statutory definition of "meeting." Any attempt to separate the "evidentiary presentations" from the argument in support of various last best offers in such proceedings would simply require too fine a cut for the parties and arbitrators to achieve. Although such a delineation may be possible in a formal judicial hearing, such a division is inconsistent with what the record discloses regarding how this type of arbitration works. It does not appear to me that there is, or can be, a clearly defined line between argument and evidence in the "med-arb" process as described by the majority.

## III

Finally, although I agree with the judgment of the majority affirming the Appellate Court, I suggest that the majority has established a procedural hurdle not previously placed before citizens seeking information through the FOIC. The majority concludes that, since Stack asked to attend the *entire* arbitration proceeding, and the FOIC ordered the *entire* arbitration proceeding open, because at least part of the proceeding, namely, everything except the evidentiary presentation, does not have to be open, the majority need not consider whether the remainder, namely, the evidentiary presentation, must or need not be open. The premise of this conclusion, however, is simply that Stack made too broad a request.

Thus, had Stack asked to attend only the evidentiary portions of the proceedings, the majority would be faced squarely with deciding whether she had the right to do so. Because she asked to attend the entire proceeding, however, the majority has declined to decide whether she is entitled to attend a certain part of it. When faced with such issues in the past, we have delineated what portions of the information requested were and were not public under the FOIA and remanded for further proceedings. See *West Hartford* v. *Freedom of Information Commission*, 218 Conn. 256, 588 A.2d 1368 (1991).

"As a practical matter, the FOIA is used repeatedly by members of the public who are unschooled in technical, legalistic language distinctions." *Perkins* v. *Freedom of Information Commission*, 228 Conn. 158, 167, 635 A.2d 783 (1993). Just as we determined in *Perkins* that "[i]t would be unreasonable to deny a member of the public access to the FOIA simply because of arguable imperfections in the form in which a request for

public records is couched"; id.; it is also unreasonable to require that a member of the public disaggregate her request into its component parts in order to receive a definitive ruling on the validity of that request. This is especially true in this case, where the division of the proceeding into component parts is the creation of the majority's analysis and was not suggested by any of the parties or the witnesses who described the arbitration process.

In sum, I would affirm the judgment of the Appellate Court on the ground that the last best offer arbitration proceedings in this case were not within the definition of "meeting" contained in § 1-18a (b).

BERDON, J., dissenting. The issue before this court is whether the people of the town of Glastonbury, and indeed the public at large, have a right to know what transpires before a formal arbitration proceeding that will have a direct effect upon the town's public education and the costs of operating the public schools. In my view, the Freedom of Information Act (FOIA)[1] requires that all formal proceedings before arbitrators appointed pursuant to the Teacher Negotiation Act (TNA),[2] including the last best offers submitted into evidence by the parties during this proceeding, be open to the public.

I begin my analysis with the principles that not only serve as the theoretical underpinnings of the FOIA, but also govern our interpretation of the act and our application of its provisions. In *Ottochian* v. *Freedom of Information Commission*, 221 Conn. 393, 398, 604 A.2d 351 (1992), this court unanimously held that "the general rule under the [FOIA] is disclosure . . . ." The FOIA "expresses a strong legislative policy in favor

---

[1] General Statutes §§ 1-18a and 1-21.
[2] General Statutes § 10-153a et seq.

of the open conduct of government and free public access to government records. . . . At the time of its unanimous passage by the General Assembly, the act was noted for making sweeping changes in the existing right to know law so as to mark a new era in Connecticut with respect to opening up the doors of city and state government to the people of Connecticut. . . . As Representative Martin B. Burke, who sponsored the bill which was enacted, expressly stated on the floor of the house, the intent of the act is to make every public record and every public meeting open to the public at all times with certain specified exclusions.'' (Citations omitted; internal quotation marks omitted.) *Board of Trustees* v. *Freedom of Information Commission*, 181 Conn. 544, 550, 436 A.2d 266 (1980). In light of these underlying principles, therefore, we must narrowly construe any exceptions or exemptions to its guiding rule of openness. *Ottochian* v. *Freedom of Information Commission*, supra, 398; *Wilson* v. *Freedom of Information Commission*, 181 Conn. 324, 329, 435 A.2d 353 (1980). ''The burden of proving the applicability of an exception to the FOIA rests upon the party claiming it.'' *Rose* v. *Freedom of Information Commission*, 221 Conn. 217, 232, 602 A.2d 1019 (1992).

Justice Borden, in his concurring and dissenting opinion, and the majority profess to adhere to these beneficent purposes of the FOIA. In practice, however, these justices narrowly construe the FOIA. The concurring and dissenting opinion would keep the entire proceedings before the arbitration panel from public scrutiny. The majority, which addresses only whether the evidence of the last best offers submitted by the parties is available to the public, concludes that it is not. These interpretations of the FOIA serve only to undermine and weaken its provisions.

All aspects of collective bargaining are not, as the concurring and dissenting opinion would hold, exempt

from disclosure. Rather, as the majority notes, what the legislature intended to exclude from the requirements of the FOIA "is not *all* collective bargaining, but only 'strategy or negotiations' sessions that relate to collective bargaining. . . . Had the legislature intended a broader exclusion, it could have excluded 'collective bargaining' without limitation, or it could have excluded 'collective bargaining, including but not limited to strategy and negotiations relating thereto.' . . . It chose neither of these options." (Emphasis in original.)

Nevertheless, I do not agree with the conclusion that the majority proceeds to draw from its interpretation of this language. The majority holds that the public does not have the right to attend arbitration hearings in which the parties present last best offers. The majority's reasoning on this point is, at best, tenuous. It begins with a characterization of the TNA arbitration proceedings that is not supported by anything in the record or in extrinsic sources, and concludes that "the actual presentation of last best offers by the parties sufficiently resembles 'negotiations,' despite the fact that they occur during a proceeding denominated as 'arbitration,' to be excluded from the 'meeting' requirements of the FOIA." I strongly disagree with both the majority's premise and the conclusion that it draws therefrom.

The majority, under the guise of interpreting the "underlying realities of the TNA process," declares that arbitration conducted pursuant to General Statutes § 10-153f "does not operate as a typical quasi-judicial process, but rather as a stylized or ritualized mediated negotiation process."[3] Yet this suggestion that the arbitration proceeding is akin to mediated negotiation is not supported by the statutory scheme, the record before us, or any of the professional literature.

---

[3] I confess that I am not entirely certain what it means for a process of negotiation to be "stylized or ritualized."

The legislature has established a three-tiered system that is designed to lead to a collective bargaining agreement between teachers[4] and their local school board. Initially, the two sides attempt to negotiate an agreement that is mutually acceptable. See General Statutes § 10-153d (requiring representatives of both sides to negotiate). If negotiation fails, either party or the commissioner of education may institute mediation. General Statutes § 10-153f (b). The statute allows the two sides to select a single mutually acceptable mediator, or the commissioner may select the single mediator. General Statutes § 10-153f (b). If mediation fails to produce an agreement, the dispute proceeds to the arbitration stage. The neutral party may consist of either a single arbitrator or a panel of three arbitrators. If the parties agree to have a single arbitrator decide the issues, the commissioner must select that arbitrator at random from a designated pool. General Statutes § 10-153f (c) (1); see General Statutes § 10-153f (a). If the parties agree on a three person panel, each side selects one arbitrator and the commissioner selects the third at random from the designated pool. General Statutes § 10-153f (c) (1). During the arbitration hearing, "each party shall have full opportunity to submit all relevant evidence, to introduce relevant documents and written material, and to argue on behalf of its positions." General Statutes § 10-153f (c) (2).

The majority's interpretation of the arbitration proceeding as "mediated negotiation" is wholly inconsistent with this statutory scheme. The parties only reach the final step of arbitration after they have attempted mediation unsuccessfully. Unlike the mediation process, where the statute expressly contemplates that each side will make "confidential communication" to the private

---

[4] The three-tiered process also applies to administrators. See General Statutes § 10-153f (b). For convenience, I refer only to teachers.

mediator,[5] the statutory arbitration proceedings are set forth by statute as quasi-judicial proceedings in which the parties present evidence and argue their cases.

Moreover, there is nothing in the record to support the majority's characterization of the arbitration process. Although it is true that each side may change the substance of its "last best offer" between the beginning of the hearing and its conclusion, this fact alone does not suggest that the arbitrators have any involvement other than as neutral decision makers. Indeed, there is evidence in the record to the contrary. Donald J. Deneen, one of the three arbitrators who served on the arbitration panel in this case, testified before the freedom of information commission (FOIC) that each side caucuses privately and decides what its "last best offer" shall be. Deneen indicated that the arbitrators are not involved in these decisions: "The offers are decided by each side. *They present their offers to us.*" (Emphasis added.) Moreover, Deneen indicated that the mediation procedures and arbitration procedures are completely distinct from one another. As he explained, "we're not involved until they have gone through the time frame of the mediation phase of the process." This version of events, and of the nature of the arbitration hearing that was conducted in this case, is fully supported by the findings and conclusion of the FOIC, which determined that neither strategy nor negotiations occurred during the arbitration proceeding in this case.[6] The majority, contrary to well estab-

---

[5] General Statutes § 10-153f (b) provides that "[i]n any civil or criminal case, any proceeding preliminary thereto, or in any legislative or administrative proceeding, a mediator shall not disclose any confidential communication made to such mediator in the course of mediation unless the party making such communication waives such privilege."

[6] The decision of the FOIC included the following factual findings and legal conclusions:

"13. It is found that the parties to a contract dispute can negotiate an agreement on their own with respect to *any* of the disputed issues, prior

lished law,[7] chooses to ignore these factual findings of an administrative agency and instead substitutes its own belief that the arbitration proceeding constituted "mediated negotiation."

Finally, the professional literature that addresses impasse resolution procedures contradicts the approach taken by the majority. Indeed, this literature universally indicates that when mediation has failed and the dispute has proceeded to arbitration, the resulting proceeding is quasi-judicial in character. In interest arbitration, the arbitrators "endeavor to give the parties a fair and impartial hearing." D. Dilts & W. Walsh, Collective Bargaining and Impasse Resolution in the Public Sector (1988) p. 118. Under such a scheme, "issues not resolved through negotiation, fact-finding, or mediation are required to be submitted to an arbitration board whose decision is final and binding." J. Grodin, D. Wollett & R. Alleyne, Collective Bargaining in Public

---

to the determination of the respondent panel and that any stipulation of the parties overrides the 'last best contract offer' delivered at the hearing.

"14. It is found that the respondents *failed to prove, in this case, that collective bargaining negotiations actually occurred during the hearing in question.*

"15. It is therefore concluded that although the respondent panel's hearings may and often do lead to further negotiation, the actual arbitration hearing in this case, during which the parties offered evidence and argument, constituted a meeting within the meaning of [General Statutes] § 1-18a (b), which should have been open to the public pursuant to [General Statutes] § 1-21 . . . ." (Emphasis added.)

[7] "[J]udicial review of an administrative agency's action is governed by the Uniform Administrative Procedure Act; General Statutes § 4-166 et seq.; and . . . the scope of review is limited. . . . Accordingly, we must decide, in view of all the evidence, whether the agency, in issuing its order, acted unreasonably, arbitrarily or illegally, or abused its discretion. . . . Conclusions of law reached by the administrative agency must stand if the court determines that they resulted from a correct application of the law to the facts found and could reasonably and logically follow from such facts. . . . Neither this court nor the trial court may retry the case or substitute its own judgment for that of the [administrative agency]. . . ." (Citations omitted; internal quotation marks omitted.) *Ottochian* v. *Freedom of Information Commission*, supra, 221 Conn. 397.

Employment (3d Ed. 1979) p. 273. The parties to such a procedure, like parties to a judicial proceeding, usually may request continuances, stays, inspections and site visitations. D. Dilts & W. Walsh, supra, p. 118. Indeed, as indicated above, the legislature in this state has expressly provided in the TNA for parties to submit evidence and to argue on behalf of their respective positions during the arbitration stage. These sources all indicate that, unlike the interpretation of the majority, interest arbitration is more accurately characterized as a judicial process, not a mediation process. I would be very much surprised that an arbitrator, who must make the final decisions on these contested matters, would participate in negotiations between the parties. See, e.g., *O & G/O'Connell Joint Venture* v. *Chase Family Ltd. Partnership No. 3*, 203 Conn. 133, 146–47, 523 A.2d 1271 (1987) (arbitral "misconduct," which is grounds for a court to vacate an arbitration award, includes "participation in ex parte communications with a party or a witness, without the knowledge or consent of the other party").

The majority quotes a single commentator as support for its interpretation of "the general understanding of how compulsory binding interest arbitration hearings are usually conducted." It quotes that commentator for the proposition that the neutral party "customarily works out solutions in the presence of and with input from the parties." C. Rehmus, "Interest Arbitration," in Portrait of a Process: Collective Negotiations in Public Employment (1979) p. 220. That commentator, however, is not describing arbitration. Rather, that commentator is expressly referring to a completely different procedure known as mediation-arbitration. "Mediation-arbitration (med-arb) combines the two dispute settlement techniques of mediation and arbitration, just as the name implies. Under med-arb, the mediator becomes the arbitrator with binding author-

ity to settle any issue not resolved . . . ." D. Dilts & W. Walsh, supra, p. 167. This is an alternative approach to mediation and arbitration, "in which the neutral [party] is expected both to mediate the dispute and, if he is not successful, to decide it." J. Grodin, D. Wollett & R. Alleyne, supra, p. 274. Nevertheless, on this tenuous basis, the majority concludes that "the actual presentation of last best offers by the parties sufficiently resembles 'negotiations' " to allow these offers to be kept from public disclosure. In Connecticut, however, the three-tiered system crafted by the legislature provides for different individuals to mediate the dispute and to arbitrate it.[8] Therefore, the med-arb procedure, and the observations of the lone commentator cited by the majority, are of absolutely no relevance in interpreting our own system of dispute resolution.

Most importantly, the very narrow scope of the FOIA's exemption for strategy or negotiations dovetails with the necessity of public accountability for any decisions reached with regard to teacher contracts. If a local board of education negotiates with the teachers union in hopes of reaching a settlement, the FOIA exemption provides that those negotiations need not be disclosed. That secrecy in government, however, can be tolerated because if the negotiations do, in fact, result in a settlement, the board of education will be

---

[8] The majority appears to rely completely on the commentator's assessment that "[f]lexible final-offer procedures . . . almost inevitably result in a proceeding which is known as mediation-arbitration . . . ." C. Rehmus, supra, p. 219. Although the commentator's analysis on this point is not entirely clear, the fact remains that the commentator, in describing a process in which "the neutral [party] customarily works out solutions in the presence of and with input from the parties," is referring to a pure med-arb proceeding. Id., p. 220. That commentator notes that in pure med-arb, the parties jointly select a single person to act as their mediator and arbitrator. Id. This requirement of a single person to act in both roles is crucial, for the "parties are thus able to assure themselves that the neutral [party] has considered all of their arguments before a final decision is made." Id.

held directly accountable by the public for the terms of the settlement to which it agreed. On the other hand, if the new contract is imposed upon the parties by an arbitrator or arbitration panel, the board of education will not be held directly accountable for the terms of the contract; rather, the board would be insulated from public criticism because the contract was imposed by a quasi-judicial decision maker. It is for this reason that secrecy cannot be tolerated during those arbitration proceedings. The public must be able to learn what the board of education proposed and what evidence it presented to the arbitration panel. Only in this manner will members of the public be able to hold their local board accountable for any failure to represent properly their interests before the neutral arbitral panel.[9]

Neither the majority nor Justice Borden, in his concurring and dissenting opinion, attaches significance to this fundamental need for accountability. According to the majority, the public can be prevented from learning what type of contract offer the board of education has made. Indeed, the majority does not make clear whether the public would *ever* be allowed to discover this information, even after a new contract has been reached. According to the concurring and dissenting opinion, the public does not have the right to know what type of contract offer the board of education has made, or what types of evidence the board presented in support of that offer. These approaches allow government, and specifically the local board of education, to

---

[9] Although § 10-153f (c) (4) provides that the arbitrator or arbitrators must render a written decision that "states in detail the nature of the decision and the disposition of the issues" and that includes "a narrative explaining the evaluation . . . of the evidence presented for each item," that statute does not expressly require the written decision to enumerate the last best offers submitted by the parties during the arbitration hearing. Accordingly, the plain language of the statute does not make clear whether a written decision by the arbitrator or arbitrators must contain this information.

operate in secrecy without any direct accountability to the public. The central, underlying purpose of the FOIA—to allow the people to know what their government is up to[10]—is not served by the court today.[11]

I respectfully dissent.

[10] I paraphrase Henry Steele Commager, who wrote: " 'The generation that made the nation thought secrecy in government one of the instruments of Old World tyranny and committed itself to the principle that a democracy cannot function unless the people are permitted to know what their government is up to.' " *Environmental Protection Agency* v. *Mink*, 410 U.S. 73, 105, 93 S. Ct. 827, 35 L. Ed. 2d 119 (1973) (Douglas, J., dissenting), quoting The New York Review of Books, Oct. 5, 1972, p. 7; see *Gifford* v. *Freedom of Information Commission*, 227 Conn. 641, 676, 631 A.2d 252 (1993) *(Berdon, J.,* dissenting).

[11] I do not understand how the majority can decide only whether last best offers must be disclosed, without also deciding whether other evidence submitted by the parties during the arbitration proceeding must also be disclosed. Although the proceedings at issue in this case have long since been concluded, the majority justifies the decision that it does render "because of the continuing order to the plaintiffs to conduct future negotiations in accordance with the FOIC order under challenge in this appeal." If the majority must decide for the future whether last best offers must be disclosed, surely it must also decide for the future whether other relevant evidence presented by the parties during that hearing must also be disclosed. No arbitration hearing conducted pursuant to the TNA consists only of the presentation of last best offers. Rather, in accordance with § 10-153f (c) (2) and (4), the parties also submit supporting evidence, including evidence of financial capability, working conditions and the like. Though the majority insists that it needs to decide this case in order to provide guidance for the future, it fails to provide such guidance. Indeed, as a result of this decision, arbitrators in the future will not know whether they may keep the entire arbitration proceeding secret, or only a part of it.