[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] RULING ON PLAINTIFF'S APPLICATION FOR TEMPORARY AND PERMANENT INJUNCTION
The plaintiff Waterbury Firefighters Association, Local 1339 ("Union") seeks a temporary and. permanent injunction res raining the defendant Waterbury Financial Planning and Assistance Board. ("Board.") from serving as the binding arbitration panel responsible for resolving the collective bargaining dispute between the Union and defendant City of Waterbury ("Waterbury").
I Procedural History
This matter was previously before the court in connection with the plaintiff's application for a temporary restraining order. On July 24, 2001, following testimony and argument, the court, Holzberg, J . . . denied the plaintiff's application, ruling that, in accordance with the standards governing the award of injunctive relief, the plaintiff had. failed. to satisfy its burden of demonstrating that it: (1) lacked an adequate remedy at law; (2) was likely to suffer irreparable injury; and (3) was likely to prevail on the merits after a full hearing. CT Page 13468-gd
Thereafter, the plaintiff requested and was provided a hearing in connection with its application for a temporary injunction. The parties stipulated. that the temporary injunction hearing would also serve as the hearing on the plaintiff's application for a permanent injunction, and that the court should issue a consolidated ruling on both applications.[1]
II Factual Background
The facts giving rise to this dispute are largely undisputed. Special Act No. 01-1 was approved by the General Assembly on March 9, 2001. As set forth in § 1 of the Act, the legislation is based on-the express finding of the General Assembly that "a financial emergency exists with regard to the city of Waterbury, that the continued existence of this financial emergency is detrimental to the general welfare of the city and the state" and that "the resolution of this financial emergency is a matter of paramount public interest and that to achieve this resolution it is necessary, appropriate and an essential public purpose to provide in this act for the financing of deficits resulting from the city's operation, the imposition of financial management controls and the creation of the Waterbury Financial Planning and Assistance Board. . ."
The legislative history of S.A. 01-1 reflects that the bill was enacted. in response to Waterbury's dire financial circumstances. With almost 90% of its budget dedicated. to labor costs, the city anticipated. running a two-year deficit of $50 million; its pensions were underfunded by approximately $400,000,000; its bonds were rated. one step above junk bond status; and without emergency relief it would be unable to meet its payroll for thousands of municipal employees. As a result of these extraordinary circumstances legislators recognized the necessity of the Board having the authority to remedy years of gross fiscal mismanagement spanning successive mayoral administrations by allowing the Board to implement modern management systems and to effectively control soaring costs including those related to municipal pensions, wages and benefits.[2]
Pursuant to § 1 of the Act the Board consists of seven (7) members including the Secretary of the Office of Policy and Management, who serves as the Board's chair, the State Treasurer or her designee, the mayor of Waterbury and four members appointed by the Governor, one of whom shall be the chief executive officer of a bargaining unit representing city employees. The Special Act confers on the Board both financial oversight and labor relations responsibilities, and provides CT Page 13468-ge the Board with wide ranging authority with respect to its principal obligation of restoring the city's financial stability. With respect to its financial oversight responsibilities, §§ 11(a)(1), (2), (3), and (4), requires the Board to approve the city's annual budget, an initial financial plan, the issuance of short and long term bonds and all collective bargaining agreements. In this capacity the Board developed an interim budget for the fiscal year ending June 30, 2002, containing line items for various expenses including employee benefits and compensation. The amounts budgeted. for wages and compensation in the 2002 fiscal year interim budget are the same as for fiscal year 2001. The 2002 interim budget contains contingency and salary adjustment line items totaling $3.2 million.
The Board also has important labor relations responsibilities. S.A. 01-1
§ 5 specifies that: (1) the Board shall replace any binding arbitration panel constituted. under MERA; (2) the time limits otherwise applicable to arbitration proceedings are to be reduced by one half; and (3) the "board. shall not be limited. to consideration and inclusion in the collective bargaining agreement of the last best offers or the matters raised. or negotiated. by the parties." Other than these three exceptions, the parties agree that S.A. 01-1 § 20 provides that the same policies, practices and procedures governing interest arbitration under the Municipal Employee Relations Act[3] are to govern the Board in its capacity as an arbitration panel.
In September, 2000, the union and city entered into binding arbitration pursuant to the Municipal Employees Relations Act (MERA), General Statutes § 7-467 et seq., as a result of the Waterbury Board of Alderman's refusal to approve a collective bargaining agreement entered into by the union and the city. Because the arbitration commenced prior to the passage of S.A. 01-1, the Board succeeded the tripartite panel constituted under MERA as the binding arbitration panel empowered to resolve the dispute between the city and the union.
Pursuant to § 10(b) the Board is required to "adopt its own procedures for the conduct of its meetings." In accordance with this provision, the Board promulgated "Organization and Policies of the Waterbury Financial Planning and Assistance Board Relating to Labor Powers" (O P). Article II of the 0 P sets forth detailed rules of procedure for binding arbitration. Bach party is permitted to make an opening and closing statement limited to twenty minutes, unless enlarged by the Board, to present evidence, to cross examine witnesses, and to file briefs. The O P also incorporate by reference Exhibit A, captioned "Proposed Collective Bargaining Rules Contracts Subject to the Municipal CT Page 13468-gf Employee Relations Act Waterbury Financial Planning and Assistance Board." The Rules set forth the abbreviated time frames for the conduct of the arbitration hearings, authorize the submission by the parties of their proposed collective bargaining agreements and identify the criteria governing the Board's final decision. The Rules also specify that each party is to file a statement with the Board indicating those portions of the opposing party's proposed contract acceptable to ft. In a departure from the usual MERA procedures governing binding arbitration, the Board is not bound by the agreement of the parties or limited to consideration of only those issues the parties identify as being in dispute. Rather, the Rules also direct that "within 5 days after the commencement of the hearing the Board shall identify those paragraphs with which it has concerns."
On July 16, 2001, the Board commenced hearings in its capacity as the successor to the MERA arbitration panel. The focus of chat hearing was the City of Waterbury's ability to pay the cost of the proposed contract with the union. In connection with chat subject matter the Board's chair, Marc Ryan, who is the Secretary of the Connecticut Office of Policy Management, ruled, over the objection of the union's counsel, that the Board proceeding would be open to the public end press, but that he would consider meeting in executive session "if there is actual strategy or bargaining going on." (Transcript July 16, 2001, p. 4 at lines 15-16.) Ryan's ruling was based on his understanding of applicable Supreme Court precedent and his belief that "if a reporter, if the public wanted to attend to hear about the City's ability to pay, certainly I don't think anyone can argue that either side's case is hurt by having the public hear the City's ability to pay." Id. at 7. At a subsequent hearing the Board, at the plaintiff's request, closed a portion of the hearing based on its finding that the matters under discussion involved "strategy or bargaining."
III Claims of Law
The plaintiff advances three separate and distinct arguments in support of its application that the Board be enjoined from continuing to serve as a binding arbitration panel. First, in count. seven, it alleges that the Board's decision to allow the proceedings to be open to the public and media violates the provisions of both Freedom of Information Act and the Municipal Employee Relations Act. Second, it argues that the policies and procedures adopted by the Board for the conduct of the arbitration proceedings are in conflict with, and in violation of, the terms of S.A. 01-1 and MERA. Finally, it claims that S.A. 01-1, as interpreted and applied by the Board, violate the union's constitutional rights to due CT Page 13468-gg process and to contract. Each of these arguments will be considered in turn.
The legal basis for granting an injunction is well established. To obtain an injunction, a plaintiff must establish each of the following: (1) lack of an adequate remedy at law; (2) irreparable injury if the injunction is denied; (3) likelihood of success on the merits; and (4) the balance of equities favors granting the injunction. See WaterburyTeachers Assn. v. Freedom of Information Commission, 230 Conn. 441, 446,645 A.2d 978 (1994). In applying this test our Supreme Court has consistently reiterated that "[t]he issuance of an injunction is the exercise of an extraordinary power which rests within the sound discretion of the court, and the justiciable interest which entitles one to seek redress in an action for injunctive relief is at least one founded on the imminence of substantial and irreparable injury. It is not enough to show that the defendant has violated the . . . regulations. The plaintiff seeking injunctive relief bears the burden of proving facts which will establish irreparable harm as a result of that violation . . . Injunctive relief may not lie where it is predicated on the fears and. apprehensions of the party applying for it or where it would be incompatible with the equities of the case; and likewise, the power of equity to grant such relief may be exercised only under demanding circumstances. The extraordinary nature of injunctive relief requires that the harm complained of is occurring or will occur if the injunction is not granted. Although an absolute certainty is not required., it must appear that there is a substantial probability that but for the issuance of the injunction, the party seeking it will suffer irreparable harm."Karls v. Alexandra Realty Corporation, 179 Conn. 390, 401-02 (1980) (Internal quotations and citations omitted). Moreover, "courts will act with extreme caution where the granting of injunctive relief will result in embarrassment to the operations of government." CEUI v. CSEA,183 Conn. 235, 249, 439 A.2d 321 (1981).
It is essential that the plaintiff satisfy all four prongs of the test set forth in Waterbury Teachers Assn. v. Freedom of InformationCommission, supra. Failure to satisfy any one of the tests deprives the court of authority to grant the requested. relief. Because the court concludes that the plaintiff has failed. to demonstrate that it will suffer irreparable injury and. the likelihood of success on the merits, it declines to grant the plaintiff's application.[4]
A. Public and media access to the arbitration hearing
CT Page 13468-gh
In count seven of its complaint the plaintiff asserts that the arbitration proceedings conducted by the Board pursuant to S.A. 01-1
§ (5) should be closed to the public. It argues that, assuming the Board is a public agency within the meaning of the Freedom of Information Act; General Statutes § 1-200 et seq; arbitration proceedings are comprised of "strategy or negotiations" and therefore are excepted from the general rule requiring that agency meetings be open to the public.[5]
Specifically, plaintiff argues that under the Freedom of Information Act only those activities defined in General Statutes § 1-200(2) as "meetings" are required to be open to the public. Under this definition "meeting shall not include . . . strategy or negotiations with respect to collective bargaining". Because plaintiff believes that arbitration concerning the terms of a collective bargaining agreement, such as that now underway before the Board, involves "strategy or negotiations with respect to collective bargaining" the arbitration proceeding should be closed to the public, as they do not constitute meetings within the meaning of § 1-200.
Similar claims previously have been rejected by the Supreme Court inGlastonbury Education Assn. v. Freedom of Information Commission,234 Conn. 704 (1995) and Waterbury Teachers Assn. v. Freedom ofInformation Commission, 240 Conn. 835 (1997). In both cases the Supreme Court's analysis began with its recognition of the strong presumption in favor of public access to the meetings and proceedings of public agencies. "The overarching legislative policy of the FOIA is one that favors the open conduct of government and. free public access to government records. The sponsors of the FOIA understood the legislation to express the people's sovereignty over the agencies which serve them; and. this court consistently has interpreted. that expression to require diligent protection of the public's right of access to agency proceedings. Our construction of the FOIA must be guided. by the policy favoring disclosure and exceptions to disclosure must be narrowly construed." Glastonbury v. Education Assn. v. Freedom of InformationCommission, supra, 234 Conn. 704 at 711-12 (internal quotations and. citations omitted.)
Specifically, in Glastonbury, the court was asked to decide whether the Freedom of Information Commission's ruling that arbitration proceedings conducted pursuant to the Teacher Negotiation Act be open to the public failed to give proper consideration to the "strategy and negotiation" exception to the public meeting requirement of the FOIA. In concluding that the FOIA's ruling was overbroad, the Supreme Court articulated. the fundamental principle that guides this court's analysis. "[T]he statutory CT Page 13468-gi definition of public meetings contained in § 1-18a(b)9 (now §1-200(2) must be read to limit rather than to expand the opportunities for public agencies to hold closed hearings. Accordingly, the language providing that public meetings `shall not include . . . strategy or negotiations with respect to collective bargaining' means, as the FOIC maintains, that what is excluded from the term `meeting' is not all
collective bargaining, but only `strategy or negotiations' sessions that relate to collective bargaining. This interpretation accords proper respect for the manifest legislative policy expressed in the FOIA. It also comports with its legislative history, which suggests that the collective bargaining exception was understood to provide privacy for the `give-and-take in negotiating sessions of collective bargaining. Had. the legislature intended a broader exclusion, it could have excluded "collective bargaining' without limitation, or it could. have excluded "collective bargaining, including but not limited. to strategy or negotiations related thereto.'" Id., at 712-713 (emphasis in original.)[6]
The ruling in Glastonbury requires that arbitration proceedings concerning the terms of a collective bargaining agreement be open to the public and media except to the extent that the proceedings involve "strategy or negotiations." Whether a portion of an arbitration hearing constitutes "strategy or negotiations" is a question that must be answered on a case by case analysis based on the particular facts and circumstances of the arbitration. The Board's decision to conduct the proceedings in public, except to the extent that a particularized showing is made that the discussion before, or presentation of evidence to, the Board constitutes "strategy or negotiations", is legally correct. The Board's conclusion properly recognizes the substantial and important public interest in proceedings whose outcome will help determine the solvency of the city and the tax rate of its citizens. Furthermore, the Board's decision will allow the public to assess for itself whether the Board's deliberations fairly addresses the concerns of city employees. The Board's refusal to close the proceedings appropriately recognizes that the Freedom of Information Act "must be read to limit rather than to expand the opportunities for public agencies to hold closed hearings." Id. Accordingly, the plaintiff has failed to demonstrate that it will succeed on the merits with respect to count seven of its complaint.[7]
B. Violation of Special Act 01-1 and the Municipal Employee RelationsAct
In count one of its complaint the plaintiff alleges that the Board has violated both S.A. 01-1 and MERA by adopting rules that establish CT Page 13468-gj procedures governing the arbitration process that are at variance with those required by S.A. 01-1 and/or MERA. Specifically, the plaintiff claims the Board has violated the S.A. 01-1 and MERA by adopting rules that: (1) permit the Board to identify, within five days after the commencement of the hearing, those areas of concern it may have with respect to the proposed collective bargaining agreement each side is to serve on the other; (2) impose twenty (20) minute time limits on opening and closing statements; (3) authorize a Board member who is not present at a hearing to participate in the final decision subject to the member reading the transcript of any hearing the member missed.; (4) reduce the time limits for each stage of the binding arbitration process; and (5) impose additional administrative responsibilities on the parties.
Analysis of plaintiff's argument necessarily begins with consideration of three inter related provisions of S.A. 01-1. S.A. 01-1 § 20 provides that unless otherwise expressly provided in the Special Act, the provisions of MERA shall not be modified by the Act. S.A. 01-1 § 11(a)(5), in turn, specifies the three exceptions to MERA created by the Special Act: (a) the Board shall replace the binding arbitration panel constituted under MERA; (b) the time limits set forth in MERA are reduced by one-half; and (c) the Board is "not limited to consideration and inclusion in the collective bargaining agreement of the last best offers or the matters raised by or negotiated by the parties." Finally, § 10(b) of S.A. 01-1 authorizes the Board to "adopt its own procedures for the conduct of its meetings . . ." In accordance with § 10(b), the Board, as previously noted, adopted rules defined as "Organization and Policies of the Waterbury Financial Planning and Assistance Board Relating to Labor Powers." Plaintiff argues that portions of O P are in conflict with the Special Act and MERA.
It is clear from the outset that the Board has the statutory authority to promulgate rules and regulations necessary for the discharge of its multiple responsibilities. Indeed, plaintiff does not contest the Board's authority to adopt such regulations. It is equally clear that the legislature intended to modify, to the extent reflected in § 11(a) (5), certain aspects of MERA which it deemed to be inconsistent with the Board's fundamental obligation to right the sinking Waterbury financial ship. Indeed, the manifest legislative purpose of the Act is to establish a mechanism and process for administering the financial affairs of Waterbury that can respond promptly, responsibly and efficiently to the financial emergency facing Waterbury. Thus, it is that the legislature deemed it appropriate and prudent to substitute the Board for the MERA binding arbitration panel; to reduce by one-half the time frames ordinarily applicable to interest arbitration pursuant to MERA; and to CT Page 13468-gk confer plenary authority on the Board to consider and evaluate any and all matters pertaining to the collective bargaining agreement, not just those raised or negotiated by the parties.
Plaintiff's claims concerning the alleged deviation by the Board's procedures from the policies and procedures established by MERA must be considered, therefore, in light of the public necessity created by the Waterbury financial crisis and the unequivocal legislative intent that the Board respond to the emergency in a manner that would impose meaningful reform on the antiquated. and inappropriate financial practices that brought Waterbury to the present crisis. The Board's mandate, in short, is to address the immediate problems created by a budget shortfall estimated to be in excess of $50 million while simultaneously reforming the budgetary practices that resulted in the present crisis.
Against this backdrop it must be concluded that, even if certain rules and procedures established by the Board are textually inconsistent with the policies and practices utilized in MERA arbitrations, the plaintiff has failed to demonstrate that such deviations have caused, or will cause, the union irreparable injury. For example, the plaintiff strenuously objects to the rule specifying that "[w]ithin 5 days after commencement of the hearing the Board shall identify those paragraph, with which it has concern." The plaintiff claims that under existing MERA procedures the parties know at the outset of the arbitration the issues that are to be decided, whereas, according to the union, "the parties could conceivably complete their binding arbitration hearings before the Board identifies `those paragraphs with which it has concerns.'" Plaintiff's Memorandum of Law in Support of Application for Injunctive Relief, August 20, 2001, pp 7-8 (emphasis in original). Plaintiff has failed to present any evidence indicating that, in fact, the scenario it posits has occurred or is likely to occur. Further, the Board chair Mark Ryan testified that if and when the Board identifies paragraphs of the proposed agreement with which it has concerns, sufficient time will be provided to the parties to enable them to respond to those issues.
Under these circumstances even if the "five day rule" represents a deviation from MERA practices, the plaintiff has failed to sustain its burden of demonstrating that it will suffer an injury, let alone irreparable injury. "Injunctive relief may not lie where it is predicated on the fears and apprehensions of the party applying for it . . . The extraordinary nature of injunctive relief requires that the harm complained of is occurring or will occur if the injunction is not granted. Although an absolute certainty is not required, it must appear CT Page 13468-gl that there is a substantial probability that but for the issuance of the injunction, the party seeking it will suffer irreparable harm." Karls v.Alexandra Realty Corporation, supra, 179 Conn. at 390.
The same analysis governs plaintiff's other examples of the Board's claimed departure from the practice and procedures utilized in a MERA arbitration. The plaintiff, for example, argues that Board procedures establish a twenty (20) and twenty five (25) minute limit on opening and closing statements, respectively. Plaintiff fails to note, however, that the limit may be "enlarged in the discretion of the chair." Organization and Policies of the Waterbury Financial Planning and Assistance Board Relating to Labor Powers, Article II, § 2.10. More importantly, plaintiff also has failed to demonstrate that it has requested the opportunity to provide a longer opening and closing statement, that the Board has denied its request and that such denial has resulted in injury to it.
The plaintiff also cites to the rules allowing absent Board members to join in the Board's ruling, even if not present at the hearing, provided they have read the transcripts of the hearings from which they are absent as well as other sections of the regulations concerning stipulations, briefing schedules and. reduction of the time limits for exchange of last best offers. In all of these instances, even if the Board's rules are at variance with the literal language of the Special Act and MERA, the plaintiff has not demonstrated that "there is a substantial probability that but for the issuance of an injunction . . . [it] will suffer irreparable harm." Karls v. Alexandra Realty, supra. Accordingly, as to count one of its complaint, the plaintiff's request for an injunction is denied.
C. Violation of Due Process
In counts two, three, four and eight the plaintiff alleges that S.A. 01-1 violates the plaintiff's federal and. state constitutional right to due process of law. Specifically, the plaintiff claims that it is denied. procedural due process in that: (1) the Board's regulations allow a Board member not present at the hearing to decide the case after reading the transcript of testimony; (2) the Board's proposed budget for fiscal year 2002 does not contain funds for a wage increase; (3) the Special Act provides that of the total board membership of seven persons only one must be a labor representative whereas a MERA three person arbitration panel would consist of one labor representative; and (4) the plaintiff is not allowed to present evidence or argument as to any issues of concern raised by the Board on its own motion. CT Page 13468-gm
"Before we begin our analysis, we note that "[a] party who challenges the constitutionality of a statute bears the heavy burden of proving its unconstitutionality beyond a reasonable doubt and we indulge in every presumption in favor of the statute's constitutionality." In addition to showing that . . . [the statute] . . . is unconstitutional beyond a reasonable doubt, the defendant must show that "its effect or impact on him adversely affects a constitutionally protected right which he has." Finally, "[w]hile the courts may declare a statute to be unconstitutional, our power to do this should be exercised with caution, and in no doubtful case." Giordano v. Giordano, 39 Conn. App. 183, 188-89
(1995) (Citations omitted; internal quotation marks omitted).
The law governing plaintiff's due process claim is well established. In order to invoke the protection of the state and. federal due process clauses the plaintiff must first demonstrate that it has a protected property or liberty interest. Connecticut Education Assn. v. Tirozzi,210 Conn. 286 (1989). Assuming the existence of such an interest[8], "parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified. . . . It is equally fundamental that the right to notice and an opportunity to be heard `must be granted at a meaningful time and in a meaningful manner . . . Due process is a flexible principle that calls for such procedural protection as the particular situation demands." All Brand Importers,Inc. v. Department of Liquor Control, 213 Conn. 184, 208-209 (1989). (Citations omitted; internal quotation marks omitted)
In count two plaintiff claims that it is denied due process because any member of the Board who is not present at the arbitration hearing can nevertheless participate in the final decision if the member reads the transcripts. Section 2.17 of the Board's rules specifies that "all members who vote on any issue must, at a minimum, review the hearing transcripts of all hearings on the issue prior to voting if he or she was not present during the live hearing on such issue." In its brief the Board represents that, in addition to reviewing the transcripts, the members must also review all documents admitted into evidence during the live hearing.
Plaintiff's claim is not supported by applicable case law. As our courts have consistently noted., due process is a flexible concept that "does not guarantee any particular form of state procedure . . . [D]ue process is afforded. where the opportunity to present argument in support of a claim is either oral or written." Trotta v. Board of Education,32 Conn. App. 395 (1993), citing Morgan v. United States, 298 U.S. 468
CT Page 13468-gn (1936). The Board member's obligation to read the transcripts in their entirety and to review the exhibits is sufficient, in the context of an arbitration proceeding, to satisfy the demands of due process. See, also, Yareteky v. Blum, 629 F.2d 817, 823 (2nd Cir. 1980), rev'd on othergrounds, 457 U.S. 991 (1982) ("The requirement [that one who decides must hear] has to do with personal understanding of the evidence, not the mechanics by which the understanding is developed.")
Plaintiff's next due process claim, set forth in count 8, alleges, in effect, that the Board has predetermined the issue of the appropriate wage increase for the union because the amount budgeted by the Board for wages for fiscal year 2002 is the same amount budgeted for fiscal year 2001. Plaintiff's argument misconstrues the proposed budget for fiscal year 2002 and misunderstands Chairman Ryan's testimony concerning the availability of funds to pay for any wage increases resulting from arbitration. While it is true that the line item for wages in the fiscal year 2002 budget is the same as in the fiscal year 2001 budget, the 2002 proposed budget also has contingency and salary adjustment line items totaling $3.2 million. According to Chairman Ryan, these line items, together with anticipated salary savings, are available to fund any salary increases awarded by the Board in its capacity as an arbitration panel. Finally, § C.1. of Appendix A to the Waterbury Financial Planning and Assistance Board Organization and Policies requires that "those having budget appropriating authority in regard to the City of Waterbury shall appropriate whatever funds are necessary to comply with any collective bargaining agreement reached . . . through binding arbitration." It is clear, therefore, that both the City and the Board are responsible for funding any increase in personal services costs resulting from the binding arbitration process. Because the uncontroverted. testimony of Board Chairman Mark Ryan indicates that there are contingency funds available to pay for any increase in wages resulting from arbitration and because the City and Board are under a legal obligation to fund such awards, the plaintiff cannot prevail on its claim that the Board, in violation of the plaintiff's due process rights, has predetermined the question of wage increases for the union membership.
Plaintiff next claims in count four that its right to due process of law is violated by the provision of the Board's rules that allow it "within 5 days after the commencement of the hearing of the Board [to] identify those paragraphs with which it has concerns." The plaintiff claims that this provision allows the Board to identify issues of concern after the conclusion of evidence and argument, thereby depriving the union of its right to be heard. Plaintiff's argument is unpersuasive. CT Page 13468-go There is no evidence before the court indicating that the hypothetical suggested by the plaintiff has occurred or is likely to occur. Indeed., chairman Ryan testified that with respect to any issue the Board raises on its own, all parties will have a meaningful opportunity to respond. This commitment satisfies the dictates of due process. "Due process requires notice and an opportunity to be heard at a meaningful time and meaningful manner." Armstrong v. Manzo, 380 U.S. 545, 552 (1965)
In count three plaintiff claims its due process rights are violated because, of the seven members who comprise the Board, only one is a designated representative of labor. By contrast, the traditional MERA arbitration panel consists of three members, one of whom is a labor designee. Plaintiff argues that the dilution of labor representation from 1/3 to 1/7 is violative of its constitutional rights. Plaintiff does not point to any authority indicating that it has a constitutional right to a specified number of labor representatives on the arbitration panel. The constitution requires only that the plaintiff be provided with a fair and impartial hearing before a neutral decision maker. Mathews v. Eldridge,424 U.S. 319 (1976) . "Due process is flexible and calls for such procedural protections as the particular situation demands." Morrissey v.Brewer, 408 U.S. 471, 481 (1972) . Due process does not require that a hearing panel be constituted in accordance with a fixed formula.
Plaintiff's claim in counts five and six is that its constitutional right to contract, guaranteed by the fourteenth amendment to the United States Constitution is violated by the terms of the Special Act. The first part of plaintiff's claim, as set forth in count five, is that it has a constitutional right "to enter into a collective bargaining agreement of its own negotiation and. choosing, subject only to the limitations of MERA." Plaintiff's Memorandum of Law, August 20, 2001, p. 20. Plaintiff argues that by substituting the Board for the MERA panel, the Special Act infringes on its right to contract. The principal flaw in plaintiff's argument is its assumption that it has an absolute right to conduct its negotiations and arbitrations pursuant to MERA. This assertion ignores the fact that having been established by the legislature, the rules and procedures governing the collective bargaining process can also be modified by the legislature. The plaintiff does not have the right to insist that the legislature be bound in perpetuo by the statutory scheme it established when it created MERA. AFSCME Council 4 Local 681 v. City of West Haven, 43 Conn. Sup. 470 (Super Ct. 1994),aff'd., 234 Conn. 217 (1995). CT Page 13468-gp
Finally, plaintiff alleges in count six that Special Acts 01-1 impermissibly modifies the union's right to contract under Article 1 § 10 of the United States Constitution. Specifically, the union claims that the Act violates the constitutional prohibition against impairment of their contractual obligations with the City. The parties agree on the law governing this claim. Energy Reserves Group v. KansasPower Light Co., 459 U.S. 400, 412 (1983) sets forth a three part test to evaluate a calm if impairment of contract. First, "the threshold inquiry is whether the state law has, in fact, operated as a substantial impairment of a contractual relationship." (Internal quotation marks omitted.) Id. at 411. Second, "[I]f the state regulation constitutes a substantial impairment, the State, in justification, must have a significant and legitimate public purpose behind the regulation. . . . The requirement of a legitimate public purpose guarantees that the State is exercising its police power, rather than providing a benefit to special interests." (Citations omitted.) Id. at 412. Third, "[o]nce a legitimate public purpose has been identified, the next inquiry is whether the adjustment of the rights and. responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption." (Internal quotation marks and citations omitted.)
The plaintiff cannot prevail in its claim. First, there is not, in fact, an existing contract between the city and the union. The parties are in arbitration for the very reason that the previous collective bargaining agreement expired. and the city and union have been unable to agree on the terms of a new one. Even assuming that there were a contract in effect that were substantially impaired by the enactment of S.A. 01-1, such impairment "may be justified if the state regulation has a significant and legitimate purpose." Id. Unquestionably, the legislature had a significant and legitimate purpose in adopting the Act. As previously noted, the legislature made an express finding that "a financial emergency exists with regard to the city of Waterbury, that the continued existence of this financial emergency is detrimental to the general welfare of the city and state" and that "the resolution of this financial emergency is a matter of paramount public interest and that to achieve this resolution it is necessary, appropriate and. an essential public purpose to provide in this act for the financing of deficits resulting from the city's operations, the imposition of financial management controls and the creation of the Waterbury Financial Planning and Assistance Board." Plaintiff has not challenged. these legislative findings. Accordingly, it cannot prevail on its claim that the S.A. impairs its right to contract. CT Page 13468-gq
D. Summary
Plaintiff's claim for a temporary and permanent injunction is denied. In accordance with the applicable law governing the issuance of injunctions, plaintiff has failed. to demonstrate that it: (1) lacks an adequate remedy at law; (2) has suffered irreparable injury; and (3) will succeed on the merits of its claim. Accordingly, for the foregoing reasons the plaintiff's request for a temporary and permanent injunction is denied.
SO ORDERED.
Robert L. Holzberg, J.