******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ESPINOSA, J., with whom McDONALD, J., joins, and DiPENTIMA, J., joins in part, dissenting. The present appeal requires this court to resolve an issue that we left open in *Glastonbury Education Assn.* v. *Freedom of Information Commission*, 234 Conn. 704, 663 A.2d 349 (1995), namely, whether the evidentiary portions of last best offer arbitration hearings under the Teacher Negotiation Act (TNA); General Statutes § 10-153a et seq.; constitute meetings by a public agency that are subject to the requirements of the Freedom of Information Act (FOIA), General Statutes (Supp. 2014) § 1-200 et seq. I disagree with the majority's conclusion that the TNA arbitration panel in the present case does not constitute a public agency, or the functional equivalent of one, for purposes of the FOIA. Moreover, because I conclude that such arbitration panels are public agencies, and, even if they are not public agencies, they are certainly their functional equivalent, I reach the second issue presented in this appeal, and conclude that the evidentiary portions of last best offer arbitration hearings before such panels constitute meetings for purposes of the FOIA. I would therefore affirm the judgment of the trial court dismissing the appeal of the plaintiff, Martin A. Gould, from the final decision of the named defendant, the Freedom of Information Commission (commission). Accordingly, I respectfully dissent.

I

THE ARBITRATION PANEL IS A PUBLIC AGENCY

I agree with the majority that the proper inquiry in resolving the question of whether a TNA arbitration panel is a public agency begins with our decision in *Elections Review Committee of the Eighth Utilities District* v. *Freedom of Information Commission*, 219 Conn. 685, 687, 595 A.2d 313 (1991), in which we interpreted the definition of " '[p]ublic agency' " in General Statutes § 1-18a (a), now General Statutes (Supp. 2014) § 1-200 (1) (A),[1] to include subunits of a public agency.[2] For two reasons, however, I disagree with the majority that TNA arbitration panels are not public agencies for purposes of the FOIA. First, the plain language of General Statutes § 10-153f provides that TNA arbitration panels are indeed subunits of the Department of Education (department). Second, even assuming that the statutory language is ambiguous, the legislative history of § 10-153f, as well as the public policy principles underlying both the FOIA and the TNA, clarify that the legislature intended that the arbitration panel created by § 10-153f, as well as the resulting individual TNA arbitration panels, be subunits of the department.[3] I will discuss each of these two bases for my disagreement with the majority in turn.

Preliminarily, I observe that the status of the individual, three member TNA arbitration panels is inextricably intertwined with that of the arbitration panel created by § 10-153f (a), which has the sole function of serving as a "pool" from which the individual panels are created. Without the pool, there would be no individual panels, and without the individual panels, the pool would serve no active function. In order, therefore, to resolve the question of whether the individual panels are public agencies, one must examine both the pool and the individual panels as they function together. In this dissent, I will refer to the larger arbitration panel as the arbitration panel pool, and to the smaller panels as TNA arbitration panels.

A

"Because the question is one of statutory construction, we afford plenary review, guided by well established principles regarding legislative intent." *Ethics Commission* v. *Freedom of Information Commission*, 302 Conn. 1, 8, 23 A.3d 1211 (2011). It is well established that we interpret FOIA provisions in light of "[t]he overarching legislative policy of the FOIA . . . [which] favors the open conduct of government and free public access to government records." (Internal quotation marks omitted.) *Glastonbury Education Assn.* v. *Freedom of Information Commission*, supra, 234 Conn. 712. Keeping that principle in favor of openness in mind, I turn to the statutory text. The plain language of the TNA provides that the arbitration panel pool is in the department. Specifically, § 10-153f (a) provides in relevant part: "There shall be *in* the Department of Education an arbitration panel of not less than twenty-four or more than twenty-nine persons to serve as provided in subsection (c) of this section. . . ." (Emphasis added.) There is only one reasonable interpretation of the phrase "in the [d]epartment"—the arbitration panel pool is part of the department. The phrase "in the [d]epartment" is not qualified in any manner that suggests that the legislature intended to limit its meaning, and the overall statutory scheme supports the conclusion that both the arbitration panel pool and the TNA arbitration panels formed from it are part of the department, subject to the oversight of the Commissioner of Education (commissioner).

The key word in the statutory phrase is, of course, the unrestricted word "in," which is a preposition. It is a basic rule of grammar that the function of a preposition is to express the relation between the object of the preposition and the word or phrase that is being modified by the preposition. In this case, the preposition "in" connects "an arbitration panel" (the arbitration panel pool) and "the [d]epartment." Obviously, the word "in" has many different meanings, and the particular meaning depends on the nature of the two things being connected by "in."[4] Because the department and

the arbitration panel pool are organizational entities, the most logical understanding of the relationship between them is that the word "in" clarifies the organizational relationship between the two of them. That is, the arbitration panel pool is "in" the department in the sense that the department is a "whole," which includes within it a "part," the arbitration panel pool. See Merriam-Webster's Collegiate Dictionary (11th Ed. 2003) (including within definition of word "in": "used as a function word to indicate inclusion"). Nothing in § 10-153f (a) or in the remainder of the TNA controverts the plain meaning of the statement: "There shall be *in* the Department of Education an arbitration panel . . . ." (Emphasis added.) In fact, as I explain, viewing the statutory scheme as a whole confirms the common-sense reading of that statement.

In support of its position that the arbitration panel pool is not in the department, the majority focuses on only some of the statutory provisions that comprise the TNA, and fails to account for the provisions that do not support its position. Specifically, the majority places heavy reliance on the fact that § 10-153f (a) gives the governor the authority to appoint the panel members with the advice and consent of the General Assembly, and to select the names of those appointed to the arbitration panel pool from lists of names submitted by three different groups, depending on which of three categories the panel member falls under, namely: (1) those that are representative of the interests of local and regional boards of education; (2) those that are representative of the interests of bargaining representatives of certified employees; and (3) those that are impartial representatives of the interests of the public in general. General Statutes § 10-153f (a). The mere fact that the governor appoints panel members, however, does not have any bearing on the meaning of the statement that the arbitration panel pool is "in" the department. It is in fact common for the governor to appoint persons to positions on boards and commissions within executive agencies. See, e.g., General Statutes § 4-6 (governor has authority to appoint department heads, including Commissioner of Education); General Statutes § 20-139a (governor has authority to appoint members of Connecticut Board of Examiners for Opticians, which is in Department of Public Health); General Statutes § 31-102 (governor has authority to appoint members of Connecticut State Board of Labor Relations, which is in Labor Department).

The majority also argues that the statute's failure to require the department to compensate the panel members injects a degree of ambiguity into the meaning of the statement that the arbitration panel pool is "in" the department. Specifically, § 10-153f (a) provides that panel members "shall serve without compensation but each shall receive a per diem fee for any day during which such person is engaged in the arbitration of a

dispute pursuant to this section." The majority has cited to no authority, however, for the proposition that only persons who are compensated by a department or agency can be members of that body.

Furthermore, the majority's assertion that the significant degree of autonomy granted to the TNA arbitration panels supports a conclusion that "aside from having their name on the list, the arbitrators have *no association whatsoever* with the department"; (emphasis added); is blatantly wrong and contradicted by the majority's own interpretation of the statutory language to mean that the arbitration panel pool is in the department for administrative purposes. The majority's statement also ignores the complexity of the statutory scheme, which crafts a carefully balanced relationship between the TNA arbitration panels and the department. That is, the TNA simultaneously gives the panels a great degree of autonomy, yet subjects the entire arbitration process to the oversight of the commissioner, who bears the responsibility to ensure that the desired end result—an agreement between the parties—is achieved. My review of the statutory scheme reveals that, far from having no association with the department, the TNA arbitration panels are integrally connected to it. The statutory scheme as a whole confirms what the plain language of § 10-153f provides— the arbitration panel pool and the individual TNA arbitration panels are part of the department.

The commissioner's oversight authority begins immediately with the selection process for the TNA arbitration panels, a process characterized by regular guidance from the commissioner, who functions as a safeguard to prevent the process from failing. For example, the parties are required to notify the commissioner of their progress at every step of the selection process. Section 10-153f (c) (1) provides that if the parties determine to proceed with a three member TNA arbitration panel, "the commissioner shall order the parties . . . to notify the commissioner of . . . the name of the arbitrator selected by each of them. . . ." That is, the board selects an arbitrator who represents the interests of local and regional boards of education, and the employee bargaining unit selects an arbitrator who represents its interests, then each party notifies the commissioner of its selection. General Statutes § 10-153f (a) and (c) (1). With respect to the third, neutral arbitrator, the statute provides that "the parties shall notify the commissioner of the name of the arbitrator if there is . . . agreement on the third arbitrator appointed to the panel pursuant to [§ 10-153f (a) (3)] . . . ." General Statutes § 10-153f (c) (1). It is highly significant that § 10-153f (c) (1) gives the commissioner the authority to select some or all of the panel members if the parties fail to notify the commissioner of their selections as required, and authorizes the commissioner to select the impartial arbitrator if the parties cannot agree. General

Statutes § 10-153f (c) (1). These provisions establish that ultimately it is the commissioner who bears responsibility to oversee the process.

Once created, the TNA arbitration panels have a significant degree of autonomy, but the commissioner's oversight authority continues after the selection stage is completed. For example, the commissioner has the power to "order the parties to appear before said commissioner during the arbitration period. . . ." General Statutes § 10-153f (c) (1). Although this statement appears in the section addressing the selection of arbitrators, the statute does not limit in any manner the commissioner's broad authority to order the parties to appear before him or her. As long as the arbitration period continues, there is no time limit on the commissioner's authority to summon the parties, no limitation as to basis, no limitation as to the number of times that the commissioner may invoke this authority, no power on behalf of the arbitrators to circumvent the commissioner's authority, and no requirement that the commissioner consult the arbitrators before summoning the parties.

The responsibility that the commissioner has to oversee the process is confirmed by § 10-153f (c) (5), which imposes a duty upon the commissioner to "assist the arbitration panel . . . as may be required in the course of arbitration . . . ." It is difficult to reconcile the commissioner's statutory duty with the majority's assertion that there is no association between the commissioner and the TNA arbitration panels. The majority simultaneously suggests that the commissioner's duty to assist is limited to the selection stage and arises only upon a request by the panelists for assistance. I first observe that these two limitations are internally inconsistent. If the commissioner's duty to assist were limited to the selection stage, there would be no panel to request assistance. More importantly, the statutory language contains no such limitation, and the majority offers no basis for its assertion. There is no qualification whatsoever in the statutory language that the commissioner's duty to assist is limited to the selection period or only triggered upon a request by the panel. The commissioner's duty to assist extends throughout the entire arbitration period, and arises "as may be required . . . ." General Statutes § 10-153f (c) (5). This provision could not make it more clear—the commissioner is responsible for ensuring that the TNA arbitration panel succeeds by resolving the dispute between the parties.

Upon rendering a decision, the arbitrators are required to file a copy of that decision with the commissioner. General Statutes § 10-153f (c) (4). The majority misses the point of this requirement. The commissioner does not have the authority or responsibility to ensure the particulars of the agreement between the parties, only that there is an agreement, and, thus, the commis-

sioner is not authorized to reject or modify the ruling of the panel. The commissioner's responsibility is simply to ensure that the dispute is resolved. The requirement that the decision be filed with the commissioner provides an update on the progress of the arbitration. And there is good reason for the requirement that the panel keep the commissioner apprised of the progress of the arbitration. The commissioner's responsibility to oversee the process continues even after the arbitrators have rendered their decision. If the legislative body of the school district rejects the arbitration award pursuant to § 10-153f (c) (7), the commissioner must be notified. The commissioner then must select a review panel of three arbitrators or, if the parties agree, an individual arbitrator, who shall then review the arbitration decision on each rejected issue. General Statutes § 10-153f (c) (7). Thus, even after the TNA arbitration panel is finished, the commissioner's work continues, if necessary, until the dispute ultimately is resolved.[5]

B

Although I conclude that the issue is resolved under the plain language of § 10-153f, I observe that, even if I were to agree with the majority that the language is not plain and unambiguous, the extratextual sources relied on by the majority actually support my conclusion that the TNA arbitration panels are subunits of the department. The majority states that there are two reasonable interpretations of the phrase "in the Department": Either the phrase means that the arbitration panel pool is, indeed, "in" the department, or that it is "in" the department for administrative purposes only. After concluding that the plain language does not resolve which of the two meanings was intended by the legislature, the majority turns to the legislative history.

The phrase "in the Department of Education" was first added to § 10-153f (a) through No. 77-614, § 304, of the 1977 Public Acts (P.A. 77-614), "An Act concerning the Reorganization of the Executive Branch of State Government." The substantial legislative history of this omnibus act does not reference or explain the meaning of the phrase, "in the Department of Education." The overall purpose of P.A. 77-614, to reorganize the executive branch, is consistent with either interpretation of the phrase "in the Department of Education"—that it designates the arbitration panel pool as a subunit of the department or that it simply locates the panel in the department for administrative purposes. Contrasting the language of § 304, however, with other provisions within P.A. 77-614, reveals that the legislature intended, in § 304 of P.A. 77-614, to establish that the arbitration panel pool is a subunit of the department. Specifically, when the legislature intended to locate a body in a department or agency for administrative purposes only, it expressly provided so. See, e.g., P.A. 77-614, § 81 (locating Commission on Capitol Preserva-

tion and Restoration in Department of Administrative Services "for administrative purposes only"); P.A. 77-614, § 137 (locating Commission on Human Rights and Opportunities in Department of Administrative Services "for administrative purposes only"); P.A. 77-614, § 305 (locating Connecticut Historical Commission in Department of Education "for administrative purposes only"); P.A. 77-614, § 307 (locating State Commission on the Arts in Department of Education "for administrative purposes only"). The inclusion of the phrase "for administrative purposes only" in those and other sections of P.A. 77-614, contrasted with the omission of any such limiting language in § 304, which provided merely that the arbitration panel shall be "in" the department, supports my conclusion that the legislature intended that the panel actually be a subunit of the department, rather than merely administered by the department.

That conclusion finds further support in the "over-arching legislative policy" underlying the FOIA, which "favors the open conduct of government and free public access to government records. . . . The sponsors of the FOIA understood the legislation to express the people's sovereignty over the agencies which serve them . . . . Our construction of the [FOIA] must be guided by the policy favoring disclosure and exceptions to disclosure must be narrowly construed." (Citations omitted; internal quotation marks omitted.) *Glastonbury Education Assn.* v. *Freedom of Information Commission*, supra, 234 Conn. 712. The conclusion that the TNA arbitration panels are public agencies for purposes of § 1-200 (1) (A) furthers the strong public policy in favor of openness that underlies the FOIA.[6]

Finally, the conclusion that TNA arbitration panels are public agencies for purposes of the FOIA is consistent with the overall purpose of the TNA, which is to serve the state's best interest "by according teachers the right to negotiate in accordance with the terms and conditions of the [TNA]. It eliminates any need for resort to illegal and disruptive tactics."[7] *West Hartford Education Assn., Inc.* v. *DeCourcy*, 162 Conn. 566, 584, 295 A.2d 526 (1972). By assisting local boards of education and employee bargaining groups to resolve disputes that arise during the process of collective bargaining, the work performed by the TNA arbitration panels is central to the duty imposed on government by the constitution of Connecticut, article eighth, § 1, which provides: "There shall always be free public elementary and secondary schools in the state. The general assembly shall implement this principle by appropriate legislation." Put simply, by assisting in the efficient resolution of disputes that arise during the collective bargaining process, the TNA arbitration panels ensure that Connecticut is able to provide a free, uninterrupted education to the children of this state. Accordingly, the TNA arbitration panels are public agencies for purposes of § 1-200 (1) (A).[8]

## II

## THE EVIDENTIARY PORTION OF THE ARBITRATION HEARING IS A MEETING

I next address the question of whether the evidentiary portion of the arbitration hearing is a meeting pursuant to § 1-200 (2),[9] and therefore subject to the open meetings provision of General Statutes § 1-225 (a).[10] The plaintiff contends that the evidentiary portion of TNA arbitration hearings constitutes "strategy or negotiations with respect to collective bargaining"; General Statutes (Supp. 2014) § 1-200 (2); and therefore is excluded from the definition of " '[m]eeting' " in § 1-200 (2). The commission and the intervening defendants Waterbury Republican-American and Jim Moore, a journalist, respond that although the presentation of evidence during a TNA arbitration is in support of and related to strategy and negotiation with respect to collective bargaining, it is nonetheless distinguishable from the actual strategy and negotiations. I conclude that because the evidentiary portion of TNA arbitration hearings merely relates to, and does not itself constitute, strategy or negotiations with respect to collective bargaining, that portion of the proceedings is encompassed within the meaning of the term " '[m]eeting' " in § 1-200 (2), and is subject to the open meetings provision of the FOIA.

Because the question of whether the evidentiary portion of TNA arbitration proceedings constitutes a " '[m]eeting' " pursuant to § 1-200 (2) presents an issue of statutory construction, I am guided by the same statutory construction principles that have informed my discussion of whether TNA arbitration panels are public agencies pursuant to § 1-200. See part I of this dissenting opinion. Pursuant to those principles, I begin with the statutory text. Section 1-200 (2) defines the term " '[m]eeting' " to include "any hearing or other proceeding of a public agency . . . to discuss or act upon a matter over which the public agency has supervision, control, jurisdiction or advisory power." The statute then lists several exemptions from the definition of " '[m]eeting,' " including the one that is relevant to the present case, "strategy or negotiations with respect to collective bargaining . . . ." General Statutes (Supp. 2014) § 1-200 (2). The question, therefore, is whether the evidentiary portion of TNA arbitration proceedings constitutes "strategy or negotiations with respect to collective bargaining."

Before I turn to the specific question of how the evidentiary portion of TNA arbitration proceedings "fits" into the FOIA, it is helpful to understand this issue in the context of the structure of the TNA. This court previously has explained: "Although TNA arbitrations arise out of an initial failure to reach agreement in ordinary collective bargaining, they were designed

to provide incentives for further bargaining between the parties. The TNA establishes a sequence of increasingly formal collective bargaining procedures to ensure the existence of a teacher contract by the beginning of the town's fiscal year. A board of education and representatives of the teachers' union have a statutory duty to negotiate concerning salary and other conditions of employment. General Statutes § 10-153d (b). Those negotiations must commence no later than 210 days prior to the budget submission date for the board. General Statutes § 10-153d (b). If a complete negotiated settlement has not been reached by 160 days prior to the submission date, the statutes mandate that the parties proceed to mediation. General Statutes § 10-153f (b). Finally, if mediation has not settled all remaining disputes by 135 days prior to the submission date, the statute imposes mandatory last best offer arbitration. General Statutes § 10-153f (c) (1). After a hearing at which each party may present all relevant evidence, the arbitral panel 'shall resolve separately each individual disputed issue by accepting the last best offer thereon of either of the parties . . . .' General Statutes § 10-153f (c) (4)." (Footnote omitted.) *Glastonbury Education Assn.* v. *Freedom of Information Commission*, supra, 234 Conn. 714–15.

This structure of the TNA, in which arbitration proceedings—when it becomes necessary to employ them—function as an extension of the negotiation and mediation stages, makes clear that "a TNA arbitration does not operate as a typical quasi-judicial process, but rather as a stylized or ritualized mediated negotiation process in which the parties submit initial last best offers, interim last best offers and final last best offers. Throughout the process, the threat of the [TNA] arbitration panel's decision-making power provides a strong incentive for the parties to resolve outstanding issues. . . . [T]he arbitrators 'don't receive the parties' absolute final position until the very end of the hearing and the parties often and usually present a different position when they open the hearing . . . .' " (Footnote omitted.) Id., 715–16.

Despite this court's recognition of the unique nature of TNA arbitrations as a continuation of the negotiation process, we were mindful in *Glastonbury Education Assn.* v. *Freedom of Information Commission*, supra, 234 Conn. 712, that in addressing the issue of whether the presentation of last best offers constitutes strategy or negotiations with respect to collective bargaining, "[o]ur construction of the [FOIA] must be guided by the policy favoring disclosure and exceptions to disclosure must be narrowly construed." (Internal quotation marks omitted.) We explained further that "the statutory definition of public meetings contained in [§ 1-200 (2)] must be read to limit rather than to expand the opportunities for public agencies to hold closed hearings. Accordingly, the language providing that public meetings 'shall

not include . . . strategy or negotiations with respect to collective bargaining' means . . . that what is excluded from the term 'meeting' is not all collective bargaining, but *only 'strategy or negotiations' sessions that relate to collective bargaining.*" (Emphasis altered.) Id., 712–13. In light of that policy, we were careful to craft our holding narrowly, stating that "the actual presentation of last best offers by the parties sufficiently resembles 'negotiations,' despite the fact that they occur during a proceeding denominated as 'arbitration,' to be excluded from the 'meeting' requirements of the FOIA." Id., 717. Because the commission's order in *Glastonbury Education Assn.* determined that the entire arbitration hearing, including the presentation of last best offers, was subject to the open meetings provision, we held that the order was invalid. We specifically held out the possibility, however, that a more narrowly tailored order, limited to the evidentiary portion of the TNA arbitration proceedings, could be valid. Id., 718.

This court's narrow construction of the exemption for "strategy or negotiations with respect to collective bargaining" in *Glastonbury Education Assn.* v. *Freedom of Information Commission*, supra, 234 Conn. 704, is significant because, in order for a proceeding to fall within the exemption, it is not sufficient that the proceeding merely be related to or part of the collective bargaining process. The proceeding, or portion of it, must actually consist of strategy or negotiations.

We underscored this requirement, that a proceeding must itself be comprised of strategy or negotiations in order to fall under the exemption, when we again considered the scope of the exemption in *Waterbury Teachers Assn.* v. *Freedom of Information Commission*, 240 Conn. 835, 694 A.2d 1241 (1997). In that case, we addressed the issue of whether grievance proceedings were exempt from the open meetings provision of the FOIA because they constituted strategy or negotiations with respect to collective bargaining. Id., 837. We began by citing to *Glastonbury Education Assn.* v. *Freedom of Information Commission*, supra, 234 Conn. 711–13, for the proposition that the exemption does not encompass "collective bargaining proceedings in their entirety" from the open meetings requirement, but only "sessions that relate specifically to 'strategy or negotiations.' " *Waterbury Teachers Assn.* v. *Freedom of Information Commission*, supra, 839. The mere fact that the grievance procedures "[arose] out of, and relate[d] to, collective bargaining" was not sufficient to establish that the exemption applied. Id., 840. Instead, in order to determine whether grievance proceedings constituted strategy or negotiations with respect to collective bargaining, we examined the "operational characteristics" of those proceedings as established by the testimony and evidence presented to the commission. Id., 841.

Our review of that evidence revealed that the grievance process involves two stages: the presentation of evidence, and the request for a remedy. Id., 841–42. On the basis of our examination of those two stages, we held that the commission properly had concluded that, although the request for a remedy fell under the exemption, the presentation of evidence did not, because the latter did not consist of strategy or negotiations. Therefore, that portion of the grievance hearings was required by the FOIA to be open to the public. Id., 843. A significant difference between the two stages was that the request for a remedy involved bargaining back and forth between the parties, and often the grievance could be resolved at that stage of the proceedings through a new interpretation of the agreement, which could be incorporated into the original collective bargaining agreement by way of memoranda of understanding. Id., 842. By contrast, in the evidentiary portion of the proceedings, the parties "had discussed matters other than strategy or negotiation with respect to collective bargaining . . . ." (Internal quotation marks omitted.) Id. Specifically, during that portion of the proceedings, the parties presented evidence regarding the "underlying facts allegedly giving rise to the grievance . . . ." Id., 843–44. Although evidence of the underlying facts giving rise to a grievance certainly is related to the strategies of the parties, and could both relate to and impact negotiations, our decision in *Waterbury Teachers Assn.* reinforces the rule we had set forth in *Glastonbury Education Assn.* v. *Freedom of Information Commission*, supra, 234 Conn. 704, regarding strategy or negotiations with respect to collective bargaining. *Waterbury Teachers Assn.* v. *Freedom of Information Commission*, supra, 240 Conn. 837. We began by citing to *Glastonbury Education Assn.* v. *Freedom of Information Commission*, supra, 704, and noted that the proceeding must be more than related to strategy and negotiations. In order to fall under the exemption, a proceeding must actually consist of strategy and negotiations.

Consistent with the rationale in *Waterbury Teachers Assn.* v. *Freedom of Information Commission*, supra, 240 Conn. 841, in order to determine whether the evidentiary portion of TNA arbitration proceedings merely relates to, or actually constitutes strategy or negotiations with respect to collective bargaining, I examine the operational characteristics of the proceedings.[11] Specifically, I examine three characteristics of the arbitration proceedings: (1) the type of evidence presented during the proceedings; (2) the relationship between the presentation of evidence and the presentation of last best offers; and (3) the nature of communications between the parties, both in and outside the presence of the TNA arbitration panel as established by § 10-153f and the testimony before the commission. My review of the proceedings persuades me that although the presentation of evidence is related to strategy and negotia-

tions and is an integral part of the collective bargaining process at the arbitration stage, the evidentiary portion of TNA arbitration proceedings does not itself constitute either strategy or negotiations.

The types of evidence presented at a TNA arbitration are dictated by statute, and are by their very nature related to issues that are likely to be the subject of negotiations between the parties as a part of the collective bargaining process. Section 10-153f (c) (2) provides in relevant part that during the hearing, "each party shall have full opportunity to submit all relevant evidence, to introduce relevant documents and written material and to argue on behalf of its positions. At the hearing a representative of the fiscal authority having budgetary responsibility or charged with making appropriations for the school district shall be heard regarding the financial capability of the school district . . . ." The type of evidence presented is also guided by the statutory factors that the arbitrators are required to consider. In addition to presenting evidence regarding the public interest and the financial capability of the town or towns in the school district—the two factors to which the arbitrators are required to give priority—the parties may present evidence relevant to the following statutory factors considered by the arbitrators: "(A) [t]he negotiations between the parties prior to arbitration, including the offers and the range of discussion of the issues;[12] (B) the interests and welfare of the employee group; (C) changes in the cost of living averaged over the preceding three years; (D) the existing conditions of employment of the employee group and those of similar groups; and (E) the salaries, fringe benefits, and other conditions of employment prevailing in the state labor market, including the terms of recent contract settlements or awards in collective bargaining for other municipal employee organizations and developments in private sector wages and benefits. . . ." (Footnote added.) General Statutes § 10-153f (c) (4).

I next turn to the relationship between the presentation of evidence and the presentation of last best offers. Because the categories of evidence are all relevant to the issues that are likely to be the subject of collective bargaining, the content of the evidence will certainly be related to the last best offers presented by the parties. There is, however, a more functional connection between the presentation of evidence and the presentation of last best offers that is relevant to my analysis. Specifically, the testimony before the commission in the present case demonstrated that the parties to a TNA arbitration proceeding regularly use the presentation of evidence to influence the last best offers of the opposing party.

To understand this functional connection, it is helpful to view last best offers and the presentation of evidence in light of the nature of TNA arbitration proceedings.

James Larry Foy, the impartial arbitrator in the present case, explained during his testimony before the commission that the presentation of evidence during a TNA arbitration proceeding is greatly affected by the unique characteristics of TNA arbitration proceedings, which are a type of interest arbitration, and involve the creation of a new or amended labor contract rather than the resolution of an alleged violation of an existing contract. See generally 48B Am. Jur. 2d 118, Labor and Labor Relations § 2488 (2005). At the outset of the proceedings, as to each disputed contract issue, each party presents an initial last best offer. Often, the parties also present an interim last best offer.[13] At the end of the proceedings, the parties present final last best offers as to all remaining unresolved issues, and the TNA arbitration panel must select the last best offer of one of the parties as to each issue, with no authority to alter the terms. The selected last best offer becomes the contract term as to that issue. The panel's lack of discretion to alter the last best offers creates an incentive for the parties to resolve the dispute as to each issue rather than leaving that issue to be decided by the panel.

The effect of this all or nothing approach is that the parties' respective positions are brought closer together by the risk that by failing to compromise, they will lose entirely on that issue. As a result, the parties present the evidence with the knowledge that it will provide the panel with an evidentiary basis upon which to evaluate the final last best offers of each side of the dispute in accordance with the statutory factors listed in § 10-153f (c) (4), and that the panel must select only one side, without the authority to modify the terms. Under this system, Foy explained, each party is highly motivated to submit the last best offer that will most likely be selected by the panel, and each uses the presentation of evidence to persuade the other side that its position is the stronger one, and that failure to compromise, in light of the evidence, will result in the arbitrators selecting the presenting party's last best offer on that issue.

Gail McKinley Anderson, a field representative for the Connecticut Education Association, who represents teacher unions and education associations in negotiation, mediation and arbitration proceedings, and who also testified at the commission hearing, confirmed Foy's assessment of the link between the presentation of evidence and the parties' last best offers. Anderson explained that her decision regarding which evidence to present is part of her strategy, because she selects the evidence that she believes will most likely convince a board of education to modify its last best offer. She indicated that her selection of evidence is based on her knowledge that the TNA arbitration panel does not have discretion to modify the last best offer it selects, and she therefore presents evidence designed to persuade

a board of education that the risk of going forward without modifying its last best offer is too high.

Finally, I review the nature of the communications between the parties during the proceedings, both in and outside the presence of the panel. When Foy was questioned, during the hearing before the commission, as to whether negotiations are continuous during TNA arbitration proceedings, he responded that they are not. He conceded that in the presence of the panel, the bulk of the recorded proceedings generally consist of the presentation of evidence and argument. There is not always a bright line, however, between evidence and argument, and the structure of the proceedings is quite informal. Witnesses do not necessarily testify from a stand, and parties may make spontaneous responses to a witness' testimony. At times, in fact, the parties engage with each other in the presence of the panel, representing their positions to each other in a manner consistent with the communications one would expect during negotiations. Foy offered the following as a typical example of the type of statement one party might make to the other side on the record, in the presence of the panel: "[I]f your position [were] X on issue one rather than Y, then maybe we [could] work this thing out, but that's not your position . . . ." He also indicated, however, that the extent of this type of exchange in front of the panel tends to be limited in its scope, and that the bulk of negotiations generally occur outside the presence of the panel.

Both Foy and Anderson testified that outside the presence of the panel, the parties regularly engage in negotiations with each other and each party meets with its representative on the TNA arbitration panel to discuss strategy, receive advice from that representative, and discuss possible revisions and proposals of that party's last best offer. It is not uncommon for the representative of a party to attempt, during these ex parte communications, to persuade that party to make concessions. The third, impartial arbitrator, however, does not meet with the parties separately, and the meetings with the representative arbitrators are not recorded.

In summary, my review of the operational characteristics of the TNA arbitration proceedings leaves no doubt that communications that occur during the evidentiary portion of the proceedings are related to the parties' strategy with respect to collective bargaining. The uncontroverted testimony demonstrates that the selection and presentation of evidence are based on strategic decisions, and have the strategic purpose of persuading the other side to compromise. The fact that the presentation of evidence is part of a party's overall strategic plan and is undertaken in a strategic manner, however, does not make the presentation of the evidence itself strategy. In any judicial or quasi-judicial proceeding, the presentation of evidence is undertaken

for strategic purposes. That fact alone is not sufficient to transform the presentation of evidence into strategy. There was no testimony offered at the commission hearing that any parties discussed strategy on the record, in the presence of the TNA arbitration panel. As explained by Foy in his testimony to the commission, discussions of strategy during the proceedings are confined to discussions outside the presence of the entire panel and the opposing party, either with or without the aid of the party's panel representative. The third, impartial arbitrator is never privy to strategy discussions.

Although the connection between the presentation of evidence and negotiations is a bit more complex, I am similarly persuaded that the presentation of evidence does not, in and of itself, constitute negotiations. The presentation of evidence is certainly an important means by which the parties persuade the other side to negotiate, but the two ultimately are related, yet distinguishable. Foy, in fact, distinguished among three categories of communication that occur in the presence of the panel: presentation of evidence, argument and negotiations.[14] Although he testified that there was not always a bright line between evidence and argument, and that the proceedings tend to be somewhat informal, he did not indicate that there was a similar difficulty in distinguishing between the presentation of evidence and negotiations. He was able to give a hypothetical example of a type of communication, in the context of the presentation of evidence, which he would categorize as negotiation. In addition, both he and Anderson testified that the parties regularly negotiate with each other outside the presence of the panel. Rather than constituting negotiations, the presentation of evidence in TNA arbitration proceedings, like the presentation of evidence in grievance proceedings in *Waterbury Teachers Assn.* v. *Freedom of Information Commission*, supra, 240 Conn. 843–44, consists of the underlying facts that are relevant to, but distinguishable from, negotiations.

Because I conclude that the presentation of evidence is merely related to and does not itself constitute strategy or negotiations with respect to collective bargaining, the evidentiary portion of TNA arbitration proceedings does not fall under that exemption from the definition of " '[m]eeting' " in § 1-200 (2), and is therefore subject to the open meetings provision of the FOIA, § 1-225 (a). See footnote 10 of this dissenting opinion.

Accordingly, I respectfully dissent.

[1] General Statutes (Supp. 2014) § 1-200 provides in relevant part: "(1) 'Public agency' or 'agency' means:

"(A) Any . . . department . . . of the state . . . including any *committee of*, or created by, any such . . . department . . . ." (Emphasis added.)

Although § 1-200 has been amended since the events underlying this appeal; see, e.g., Public Acts 2011, No. 11-220, § 1; the amendments have no bearing on the merits of this appeal. In the interest of simplicity, I refer

to the current revision of the statute codified in the 2014 supplement.

In *Elections Review Committee of the Eighth Utilities District* v. *Freedom of Information Commission*, supra, 219 Conn. 687, we interpreted the phrase "committee of" to mean subunit.

[2] We specifically had noted in *Elections Review Committee of the Eighth Utilities District* v. *Freedom of Information Commission*, supra, 219 Conn. 693, that if the statute were to include within the meaning of public agency a committee "created by" the establishing public agency, the definition would be significantly broader. We explained: "A 'committee of' an agency would include a body composed solely of nonmembers of the agency to whom the agency had assigned a particular task only if the use of the possessive preposition were equivalent to 'created by.' Under such a construction, even one person, wholly unassociated with the agency except for the project assigned to him for study and recommendation, such as an outside consultant, would constitute a 'committee of' the agency." Id. Subsequent to our decision in *Elections Review Committee of the Eighth Utilities District*, the legislature expanded the definition of public agency in § 1-200 (1) (A) to include a committee "created by" a public agency. Public Acts 1993, No. 93-195, § 1. Because I conclude that a TNA arbitration panel is a "committee of" the department, however, it is unnecessary to address in this dissent whether it also is a committee created by the department. The legislature's response to this court's decision, however, supports the conclusion that it intended the definition of a committee of, or created by, a public agency to be broad enough to encompass the TNA arbitration panels. Our decision stated that if the statute included the phrase "created by," the definition would include even an outside contractor, whose only association with the agency was the project assigned to him. *Elections Review Committee of the Eighth Utilities District* v. *Freedom of Information Commission*, supra, 693. In response, the legislature added precisely that language.

[3] Because I conclude that the arbitration panel pool is a subunit of the department, I need not consider whether the panel is a public agency in its own right, independent of any relationship it has with the department. I observe, however, that although the majority has concluded that the panel is not a public agency by virtue of being part of the department, it provides no explanation as to why the panel does not otherwise fit the definition of " '[p]ublic agency' " in § 1-200 (1) (A), despite the fact that the panel is created by statute, is governed by an extraordinarily complex statutory scheme, and is comprised of members who are appointed by the governor and confirmed by the legislature. Moreover, the definition of " '[p]ublic agency' " in § 1-200 (1) (A) is extraordinarily broad, encompassing "[a]ny executive, administrative or legislative office of the state or any political subdivision of the state and any state or town agency, any department, institution, bureau, board, commission, authority or official of the state or of any city, town, borough, municipal corporation, school district, regional district or other district or other political subdivision of the state, including any committee of, or created by, any such office, subdivision, agency, department, institution, bureau, board, commission, authority or official, and also includes any judicial office, official, or body or committee thereof but only with respect to its or their administrative functions, and for purposes of this subparagraph, 'judicial office' includes, but is not limited to, the Division of Public Defender Services . . . ." General Statutes (Supp. 2014) § 1-200 (1) (A). Yet the majority provides no discussion whatsoever explaining why it has failed, in its statutory construction analysis, to consider whether the arbitration panel, even if it is not a "committee of" the department, is a public agency in its own right.

[4] Without any explanation, the majority suggests that the meaning of the word "in" is limited to indicating "physical surroundings." It then confidently asserts that the members of the arbitration panel pool are not located in the department. The only aspect of the arbitration panel pool that is "in" the department, the majority states, is the list. There is simply no basis to interpret the word "in" in such a narrow manner. To illustrate the lack of logic in the limited scope of the majority's definition: If the word "in" did indeed have such a narrow meaning, then the statement, "the Superior Court is *in* the Judicial Branch" would mean that the Superior Court is somehow physically contained within the Judicial Branch.

[5] The majority claims that the lack of an express provision in the TNA requiring that the arbitration hearings be open to the public is significant because: (1) if the legislature had wanted to make the hearings open to the public it could have so required; and (2) in light of this court's decision in

*Elections Review Committee of the Eighth Utilities District* v. *Freedom of Information Commission*, supra, 219 Conn. 685, the failure of the legislature subsequently to amend § 10-153f to reject this court's interpretation of the phrase "committee of" suggests legislative acquiescence.

As to the first point, I observe that the legislature *has* expressly required that hearings be open to the public, if the hearings are a meeting of a public agency pursuant to the FOIA. The issue in this appeal is whether TNA arbitration hearings are meetings of a public agency subject to the disclosure requirements of the FOIA. If we required an express provision in each substantive statute requiring public hearings, the open meetings requirement of the FOIA would be redundant.

As to the second point, I note that the nature of the disagreement between the majority and the dissent does not concern whether the legislature acquiesced to our interpretation of the statutory phrase "committee of" in *Elections Review Committee of the Eighth Utilities District* v. *Freedom of Information Commission*, supra, 219 Conn. 685, to mean a subunit of a public agency. We are in agreement that a subunit of a public agency is a public agency for purposes of the FOIA. Our disagreement concerns whether the arbitration panel pool and the TNA arbitration panels are subunits of the department. Moreover, as I point out in footnote 2 of this dissenting opinion, the legislature's response to *Elections Review Committee of the Eighth Utilities District* supports the conclusion that it intended to extend the meaning of the phrase "committee of" significantly by adding the language "or created by."

[6] The public policy principle favoring public access to government records is particularly strong in the present case because of the importance that this particular type of information has for the public. Expenditures on education constitute the majority of a municipality's budget. See http://www.ct.gov/opm/lib/opm/FI_2008-2012_Asof3-6-14.pdf (last visited December 2, 2014). Accordingly, the public has a strong interest in gaining access to TNA arbitration proceedings, which concern issues that have a direct effect on the cost of education in a municipality or district.

[7] This broader purpose is reflected in the impasse resolution procedures of the TNA, which are intentionally linked to a school district's budget submission date. Negotiations, for example, must commence not less than 210 days prior to the budget submission date. General Statutes § 10-153d (b). If the parties have not come to an agreement 160 days prior to the budget submission date, the parties must commence mediation. General Statutes § 10-153f (b). If a settlement cannot be reached on or before 135 days prior to the budget submission date, arbitration must commence. General Statutes § 10-153f (c) (1).

[8] I observe that the majority, with no analysis, asserts the bald conclusion that the TNA arbitration panels are not the functional equivalent of a public agency. Despite the fact that a conclusion to the contrary would render its holding invalid, the majority simply dismisses the possibility without even mentioning the four factor test used for determining whether an entity is the functional equivalent of a public agency for purposes of the FOIA, which this court first set forth in *Board of Trustees* v. *Freedom of Information Commission*, 181 Conn. 544, 436 A.2d 266 (1980). Drawing from federal law, we eschewed a formalistic approach in favor of a practical inquiry centered on the following four factors: "(1) whether the entity performs a governmental function; (2) the level of government funding; (3) the extent of government involvement or regulation; and (4) whether the entity was created by the government." Id., 554. We have emphasized that "[a]ll relevant factors are to be considered cumulatively, with no single factor being essential or conclusive." (Internal quotation marks omitted.) *Connecticut Humane Society* v. *Freedom of Information Commission*, 218 Conn. 757, 761, 591 A.2d 395 (1991).

[9] General Statutes (Supp. 2014) § 1-200 (2) provides in relevant part: " 'Meeting' means any hearing or other proceeding of a public agency . . . to discuss or act upon a matter over which the public agency has supervision, control, jurisdiction or advisory power. 'Meeting' does not include . . . strategy or negotiations with respect to collective bargaining . . . ."

[10] General Statutes § 1-225 (a) provides in relevant part: "The meetings of all public agencies, except executive sessions, as defined in subdivision (6) of section 1-200, shall be open to the public. . . ."

[11] For convenience, as I review the operational characteristics of the TNA arbitration proceedings, I refer only to the TNA arbitration panels, although the parties may elect to proceed with a single arbitrator rather than a panel. See General Statutes § 10-153f (c).

[12] James Larry Foy, the impartial arbitrator in the present case, explained in his testimony before the commission that the evidence offered in connection with this factor consists of the "[h]istory of negotiations prior to arbitration."

[13] Foy could not recall whether the parties had presented interim last best offers in the present case.

[14] In light of the fact that the parties are free to negotiate with each other outside the presence of the panel during the proceedings, the parties are obviously not compelled to engage in negotiations with each other on the record in the presence of the panel.